Richard MANGONE, etc., Plaintiffs,

v.

FIRST USA BANK, et al., Defendants.

No. 00–CV–881–MJR.

United States District Court,
S.D. Illinois.

Feb. 2, 2001.

Steven A. Katz, Carr, Korein et al., Swansea, IL, for plaintiffs.

Joseph C. Orlet, Thompson Coburn, Belleville, IL, Roman P. Wuller, Christopher M. Hohn, Thompson Coburn, St. Louis, MO, Robert Y. Sperling, Kenneth M. Kliebard, Todd L. McLawhorn, Katten, Muchin et al., Chicago, IL, for defendants.

### ORDER APPROVING CLASS SETTLEMENT

REAGAN, District Judge.

This class action arises out of the payment crediting practices for First USA Bank, N.A. ("FUSA") credit cards for payments received by U.S. mail that were processed by a third-party vendor retained by FUSA. The class action relates to the payment crediting practices of that vendor's Atlanta, Georgia, and Louisville, Kentucky, facilities. Plaintiff alleges that FUSA failed to credit payments promptly and, as a result, Plaintiff alleges that he and the Class were assessed improper late fees and other charges. Plaintiff claims that FUSA's conduct violated the federal Truth In Lending Act, the FUSA cardmember agreement, and various state laws.

In November 2000, the parties informed this Court that they had reached a settlement of Plaintiff's claims, and scheduled a hearing. By Order entered on November 21, 2000, the Court granted Plaintiff's motion for conditional class certification and certified the litigation as a class action for settlement purposes only with respect to the following Settlement Class:

> All consumers who have or have had one or more credit card account(s) owned by First USA Bank, N.A. ("FUSA"), who had credit card payments processed in payment facilities operated by a FUSA third-party vendor in Atlanta, Georgia, or Louis-

ville, Kentucky, from January 1, 1998, through August 31, 1999, as determined by FUSA's records, and who were assessed a periodic rate finance charge and/or late fee by FUSA during that period. Excluded from the class is the trial judge.

The Court designated Plaintiff, Richard Mangone, as the Class Representative, and Steven A. Katz and Douglas R. Sprong, of the law firm of Carr, Korein, Tillery, Kunin, Montroy, Cates, Katz and Glass, LLC as Class Counsel.

On November 21, 2000, the parties appeared before this Court and presented a proposed Settlement ("Settlement") of the litigation. After a hearing on the proposed Settlement and review of the Class Action Settlement Agreement ("Settlement" or "Settlement Agreement") and Notice of Class Action and Proposed Settlement ("Notice" or "Class Notice"), this Court found that the "proposed settlement is within the range of possible approval and that there is a good reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." By Order dated November 21, 2000, this Court set a Fairness Hearing for the proposed Settlement for January 24, 2001 at 9:00 a.m., to determine whether the proposed Settlement, on a class-wide basis, should be approved by the Court as fair, reasonable and adequate, and to consider such other matters as may properly come before it in connection with the hearing, including the award of attorney's fees and expenses to Class Counsel.

The Court also ordered that the Notice attached to the Settlement Agreement as Exhibit A be mailed to the last known addresses, if any, of Settlement Class Members and that the Summary Notice attached to the Settlement Agreement as Exhibit B be published three times in the nationally published newspaper, *USA Today*. The parties also agreed to publish the Notice on the Internet.

■ On January 24, 2001, pursuant to Fed.R.Civ.P. 23(e), a fairness hearing was conducted to determine whether the pro-

posed Settlement was fair, reasonable and adequate. *See Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir.1996); *see also E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 888–89 (7th Cir.1985). In making that determination, this Court considered a number of factors relating to the merits and complexity of the claims, the circumstances of the settlement, and any objections to the settlement. *See, e.g., Hiram Walker & Sons,* 768 F.2d at 889; *Hispanics United of DuPage County v. Village of Addison, Illinois,* 988 F.Supp. 1130, 1150 (N.D.Ill.1997). Specifically, the Court has examined: (1) a comparison of the strengths of plaintiff's case versus the amount of the settlement offer; (2) whether there was fraud or collusion in the settlement; (3) the complexity, duration and expense of the litigation; (4) the state of the proceedings and the amount of discovery taken in the case; and (5) the opinions of the participants, including class counsel, class representative, and absent class members. *See Isby,* 75 F.3d at 1199; *Hispanics United of DuPage County,* 988 F.Supp. at 1150. Consistent with the policy that courts favor the settlement of class action litigation, the Court has viewed the settlement components in their entirety while evaluating the fairness of the settlement. *Armstrong v. Board of Sch. Dirs.,* 616 F.2d 305, 315 (7th Cir.1980), overruled on other grounds by *Felzen v. Andreas,* 134 F.3d 873 (7th Cir.1998). The Court also considered all written and oral objections to the Settlement, and permitted all interested parties to be heard at the Fairness Hearing. Based on a consideration of these factors, the Court finds, as explained below, that the Settlement is fair, adequate and reasonable.

■ The Settlement provides monetary benefits up to approximately $39.9 million to Class Members. The Settlement compensates Class Members for payment processing problems during the Class Period, and provides Class Members with compensation for damages they could have incurred as a result of their payments being processed one or two days late, depending on the time period.[1]

---

1. The payment processing problems divide into two basic categories. The so-called "cut-off" problem spanned from January 1, 1998 through,

at the latest, February 28, 1999, at the FUSA third-party vendor's Atlanta facility, and from January 1, 1998 through, at the latest, March 31,

The Settlement remedies the three types of financial disadvantages potentially incurred by Class Members: (1) the incremental finance charge that may have resulted due to a payment being processed one or two days late; (2) any late fee that may have resulted because a payment was processed one or two days late; and (3) any interest rate increase that was caused by a payment being erroneously considered late (*i.e.*, a "reprice"). The Settlement provides a pool of $6.7 million to cover finance charges, $28.7 million to cover late fees, and $3.8 million to cover reprices.

Finance charge reimbursement will be made automatically to current FUSA cardholders ($0.38 per account). Former cardholders who are not receiving any other relief (and as former cardholders cannot receive a credit) must submit a claim to collect finance charge reimbursement, which will be $0.75 to compensate them for the additional expense of postage and handling.

Late fee distribution is similarly bifurcated, although for different reasons. Late fee reimbursement will be automatically provided to those very few Class Members for whom FUSA has records sufficient to determine the time of day payment was received. On the other hand, the vast majority of the 18.5 million Class Members, for whom FUSA cannot determine if a late fee was appropriately charged [2] must submit a half-page claim form sent to all Class Members stating that to the best of their knowledge, information and belief, they mailed their payments in a timely fashion and were nonetheless assessed late fees. The late fee refund will be $29 per late fee assessed (or pro rata share if the $28.7 million pool is exceeded), which was the typical late fee amount. Such Class Members will also receive reimbursement of $58 per account (or pro rata share of $3.8 million

if the pool is exceeded) for any reprice that occurred as a result of a late fee.

The Settlement also provides additional benefits. Defendants paid the costs of identifying and notifying the 18.5 million Class Members, administering the Settlement, calculating the benefits of the Settlement, and attorney's fees, all of which, in the event the case was fully litigated and the Class prevailed, would have been deducted from the Class recovery. By settling, the Class is avoiding the deduction of those substantial costs from its recovery. Based upon uncontroverted evidence in the record, these costs are currently in excess of $25 million.

The Court also finds that the settlement is fair, reasonable and adequate applying the factors commonly used in evaluating the fairness of a proposed class action settlement.

The first important factor in evaluating the settlement is the relative strength of Plaintiff's case as compared to Defendants' offer of settlement. *Isby*, 75 F.3d at 1199. To make this determination, a court should compare the benefits to the class under the proposed settlement with the likely rewards the class would have received following a successful trial of the case. *See Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 682 (7th Cir.1987) (finding adequate a settlement of ten percent of the total sought due to risks and costs of trial); *Hiram Walker & Sons, Inc.*, 768 F.2d at 891 (settlement approved because "[t]here [was] no showing that the amounts received by the beneficiaries were totally inadequate"); *The Susquehanna Corp. v. Korholz*, 84 F.R.D. 316, 324 (N.D.Ill.1979) (where settlement provided benefits to plaintiff class equal to "nearly two-thirds of the estimated value of their claims," court noted that "[s]uch an overall settlement, when balanced against the plaintiffs' clearly questionable prospects for

---

1999, at that vendor's Louisville facility. The "quality" or "performance" problem spanned from January 1, 1998 through, at the latest, August 31, 1999. Each problem caused a one-day delay in payment processing. Because it is possible that a payment could have been affected by both problems during the overlap (*i.e.*, January 1, 1998 through February 28, 1999 for Atlanta and January 1, 1998 through March 31, 1999 for Louisville), the Settlement provides that FUSA will adjust Class Members' accounts two days for

all payments during the overlap, and one day during the remaining period (*i.e.*, March 1, 1999 through August 31, 1999 for Atlanta and April 1, 1999 through August 31, 1999 for Louisville).

2. The unrebutted evidence at the Fairness Hearing was that most late fees were appropriately charged in accordance with the card member agreement.

prevailing on retrial, appears to this court to be decidedly adequate and fair and reasonable to all concerned").

Under this Settlement, all eligible members of the Class will have the opportunity to recover almost full reimbursement for Defendants' alleged wrongful activity. This is important given the obstacles Defendants have raised to any recovery by the Class: the difficulty Class Members would have in proving that they had received an *erroneous* late fee or finance charge as a result of Defendants' improper conduct; the arbitration clause in FUSA's cardmember agreements that might preclude the Class Members from proceeding to trial in court on any of their claims, the defenses to Defendants available under the *Truth in Lending Act*, 15 U.S.C. §§ 1601–1615 ("TILA"), including bona fide errors, unintentional violations, and the one-year limitations period under TILA, which runs from the date of the violation. 15 U.S.C. §§ 1640(c), 1640(e). In addition, the damages recoverable by the Class in the event they were to prevail on their TILA claims are capped by TILA itself. Under the statute, damages in a class action lawsuit are limited to "the lesser of $500,000 or one per centum of the net worth of the creditor." 15 U.S.C. § 1640(a)(2)(B).

The second factor to consider is that the Settlement was the result of arms-length negotiations by experienced counsel. *e.g., Isby,* 75 F.3d at 1200; *In re Mexico Money Transfer Litigation,* 164 F.Supp.2d 1002, 1019–20 (N.D.Ill.2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"); *Alliance to End Repression v. City of Chicago,* 561 F.Supp. 537, 548 (N.D.Ill.1982) ("Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel"); *Korholz,* 84 F.R.D. at 320 (a settlement proposal arrived at after arms-length negotiations by fully informed, experienced and competent counsel may be properly presumed to be fair and adequate).

Third, the attorney's fees for Class Counsel were negotiated after the settlement for the Class had been agreed to in principle. *See In re Mexico Money Transfer Litig.,* 164 F.Supp.2d 1002, 1019–20 ("To eliminate any potential conflict of interest, the parties did not engage in fee negotiation until after the settlement of Plaintiffs' claims on their merits").

Fourth, this class action litigation is substantively and procedurally complex, and much time would have elapsed before the case could proceed to trial. e.g., *Isby,* 75 F.3d at 1199 (where the "continuation of the litigation 'would require the resolution of many different and complex issues,' would 'entail considerable additional expense,' and would 'likely involve weeks, perhaps months of trial time,'" the Seventh Circuit upheld trial court's conclusion that "the settlement represented 'an outcome at least comparable, if not superior, to that which plaintiffs might achieve by proceeding to trial.'"); *In re Mexico Money Transfer Litig.,* 164 F.Supp.2d 1002, 1019–20.

Fifth, Class Counsel undertook formal and informal discovery. Class Counsel was given access, after entering into a confidentiality agreement, to thousands of documents relating to payment processing audits, payment processing guidelines, computer modeling as to damages, other lawsuits and/or complaints, and customer contacts and complaints. Class Counsel also interviewed a number of FUSA employees concerning internal operations, computer and database issues, and damages modeling. *See, e.g., Isby,* 75 F.3d at 1200 ("while settlement discussions began at an early stage in the litigation, [the court] was satisfied that the discovery and investigation conducted by Class Counsel prior to entering into the settlement negotiations was 'extensive and thorough,' dating back at least as far back as ten months prior to the filing of the complaint"); *In re Mexico Money Transfer Litig.,* 164 F.Supp.2d 1002, 1020–21 (research and investigation of claims began months before complaint filed and discovery included reviewing 86,000 documents and extensive interrogatories, consulting experts, and taking Rule 30(b)(6) depositions to confirm the information provided in settlement negotiations).

Sixth, the Settlement was strongly supported by the Class as evidenced by the extremely low percentage of opt outs and

objections. Pursuant to the Notice and Settlement Agreement, Settlement Class Members wishing to object to the Settlement were required to file their objections by January 12, 2001. As of January 12, 2001, a total of 85 objections to the Settlement were received by Class Counsel, counsel for Defendants, the FUSA Settlement Administrator, and the Court. An additional 12 objections to the Settlement were received after the January 12, 2001, deadline. The Court has considered all objections to the Settlement including those objections deemed untimely that were objected to by both parties. In addition to the written objections, the Court considered the arguments voiced by Class Members and their attorneys who presented argument at the fairness hearing. The written objections are broken down as follows: 3 Class Members believe the lawsuit is frivolous; 6 Class Members believe FUSA should be punished; 28 Class Members believe the attorney's fees sought by Class Counsel are excessive; 13 Class Members believe the claims process is complicated or burdensome; 4 Class Members disapprove of class action lawsuits in general; 25 Class Members believe that not all issues are addressed in the Settlement; 47 Class Members believe the compensation offered by the Settlement is inadequate; and 19 Class Members object for various reasons other than those stated above. Having considered each of the objections, the Court overrules all of the objections to the Settlement for the specific reasons set forth below.

Before addressing the objections, the Court initially notes that the approval by Class Members of the Settlement has been virtually unanimous. Pursuant to this Court's November 21, 2000 Order, and the terms of the Settlement Agreement, FUSA: mailed Class Notice to almost 18.5 million current or former FUSA cardmembers on or before December 5, 2000, published the Summary Notice in the December 7, 8, and 14, 2000 editions of the nationally published newspaper, *USA Today*, and published the Class Notice and other pertinent settlement documents on the Internet. Of the nearly 18.5 million Settlement Class Members, approximately 19,637 filed opt-out requests on or before the January 12, 2001 deadline.

Given the size of the Class, the number of opt-outs represents a mere 0.10614% of the Settlement Class Members. It also appears that only 97 individuals communicated objections to the settlement. Thus, the number of objectors to the Settlement (a mere 0.0052% of all Settlement Class Members) is minuscule when compared to the Class as a whole.

The opt-out and objection statistics show that approximately 99.99% of the Settlement Class elected to take part in the Settlement. In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement. *See In re Mexico Money Transfer Litig.*, 164 F.Supp.2d 1002, 1020–21 (acceptance rate of 99.9% of class members "is strong circumstantial evidence in favor of the settlements"); *Hispanics United of DuPage County v. Village of Addison, Illinois*, 988 F.Supp. 1130, 1169 (N.D.Ill.1997) (finding the settlement fair where a small number of class members objected); *In re Austrian and German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 175 (S.D.N.Y.2000) (finding a small number of objectors "indicative of the adequacy of the settlement"); and *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 141 (W.D.Ky.1992) (holding that a "small number of objectors is a good indication of the fairness of the settlement").

The Court now analyzes the specific objections. In reviewing the substance of the objections to the proposed Settlement, this Court's role is not to determine whether the proposed settlement has achieved perfection. It is true that something could always be added to every class action settlement to make it more favorable to class members, but that is not the standard by which class action settlements should be measured. Rather, as already discussed, this Court's role is limited to determining whether the Settlement is fair, reasonable, and adequate.

Some objectors complain that the Settlement Agreement does not provide sufficient benefits to the Settlement Class. These objections are belied by the terms of the Settlement Agreement and the uncontroverted evidence before the Court. As already indi-

cated, the Settlement provides for payments of up to $39.9 million to the Class. These benefits offer most Settlement Class Members 100% (or an approximation thereof) of the allegedly improper charges. This is an unusual and very desirable feature of this Settlement because settlements, by their nature, typically do not yield 100% recovery for plaintiffs. *See, e.g., Isby v. Bayh,* 75 F.3d at 1200 (the " 'essence of settlement is compromise,' " and a settlement "will not be rejected solely because it does not provide a complete victory to the plaintiffs"); *Mars Steel Corp.,* 834 F.2d at 682–83 (holding settlement of $11.5 million out of an estimated $750 million to $1.5 billion generous after considering risks of litigation and costs of trial); *Hiram Walker & Sons, Inc.,* 768 F.2d at 889 (stating that "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial").

In addition to $39.9 million being made available to the Settlement Class by Defendants under the Settlement, Defendants have also agreed to pay separately the $2.5 million sought by Class Counsel in attorney's fees as well as costs of up to $100,000. However, the biggest monetary benefit to the Class is FUSA's agreement, under the Settlement, to bear the costs of providing Class Notice and administering the Settlement which is an expense that would ordinarily be borne by class action plaintiffs. FUSA also agreed to bear the costs of the day-to-day settlement administration process, including the out-of-pocket costs of an independent settlement administrator who is processing hundreds of thousands of Proof of Claim forms submitted by Settlement Class Members. The evidence presented at the fairness hearing indicates that the actual and expected out-of-pocket expenses for settlement administration, including the Notice program, could reach $10 million. That $10 million cost excludes the substantial internal costs and resource demands placed on FUSA in the day-to-day settlement administration process. Therefore, in addition to Defendants' commitment under the Settlement to provide up to $39.9 million directly to Settlement Class Members, an additional $2.6 million for Class

Counsel's fees and costs, as well as the costs of notice and settlement administration anticipated to total $10 million were provided to the Settlement Class, which yields a maximum monetary settlement value of approximately $52 million. Thus, the Settlement provides substantial monetary benefits to the Settlement Class, and the objection that the Settlement Agreement provides insufficient monetary relief is overruled.

Some objectors attack the Settlement because it provides a maximum of $39.9 million in benefits to be paid (or credited) directly to the Class. The Court has considered those objections and has concluded, based on the evidence in the record, that such objections are without merit. The parties offered credible and uncontroverted evidence establishing that FUSA employed a fair and reasonable statistical model for estimating that $39.9 million is the maximum financial impact of the alleged payment processing errors. Given the absence of records that would permit FUSA or Class Members to determine which of the nearly 18.5 million Settlement Class Members were actually affected by the alleged payment processing deficiencies, and the possibility that many claims would be submitted by individuals who were not affected by the alleged processing deficiencies (thereby exposing FUSA to claims well in excess of a fair estimate of the Class' alleged actual damages), the Court concludes that such a cap on Defendants' Settlement liability is fair, and, accordingly, overrules any objections that the Settlement provides insufficient monetary benefits to Settlement Class Members.

Other objectors complain that the aggregate Settlement amount is too small based on the mistaken belief that FUSA will not be required to pay meaningful aggregate benefits to the Settlement Class. The Proof of Claim process is still open and will not close until March 1, 2001. The unrefuted evidence presented establishes that based on the claims processed as of January 18, 2001, Defendants are already obligated to provide cash payments or credits in excess of $11.5 million to Settlement Class Members, and that number will continue to grow as the Settlement Administrator processes addition-

al incoming claims. Therefore, the aggregate settlement amount will be significant. Thus, the Court overrules this objection.

Other objectors complain that the Settlement does not offer enough benefits because their periodic rate finance charge is not being reduced as part of the Settlement. That objection is also overruled. The record is bereft of any evidence that the objectors were contractually entitled to any specific periodic rate finance charge. The parties have also concluded that the vast majority of Settlement Class Members' interest rates were unaffected by the alleged payment processing irregularities. Nevertheless, those Settlement Class Members who experienced an increase in their periodic rate finance charge because they were assessed an Eligible Late Fee (as defined in the Settlement Agreement) between January 1, 1998, and August 31, 1999, are entitled to a Reprice Credit (as defined in the Settlement Agreement) estimated at $58 per account (or a pro rata share of the sum if Reprice Credits exceed $3.8 million). That $58 estimated payment for each Reprice Credit is based on a fair analysis of the average financial impact to repriced cardmembers. There was no evidence offered by the objectors establishing that the methodology for arriving at the estimate for a Reprice Credit was objectionable or improper. For these reasons, the Settlement fairly treats the claims of Settlement Class Members who experienced a "reprice," and these objections are overruled.

Another objection voiced is that the Settlement does not require Defendants to change credit bureau reports for Class Members. There is no competent evidence in the record that Settlement Class Members received adverse credit reporting based on the alleged payment processing irregularities. Moreover, the evidence in this case shows that the alleged payment processing irregularities would have caused typical delays of one or two days in posting a cardmember's payment. The evidence presented by the parties also establishes that a one or two day payment tardiness will not, in itself, generate a report to a credit reporting agency because it is the policy of First USA to report an account to credit reporting agencies only when the account becomes at least 60 days delinquent. Accordingly, this objection is without merit and is overruled.

Other individuals object to what they claim is an insufficient finance charge credit ($0.38 for current cardmembers and $0.75 for former cardmembers who elect to receive the Finance Charge Credit). The Finance Charge Credit reimburses Class Members for the average estimated finance charge incurred as a result of a one or two day delay in processing a payment. The financial harm from such a delay of a day or two is minimal, and the $0.38 Finance Charge Credit yielded by the statistical model employed by FUSA (which represents an average finance charge spread over Class Members who incurred a periodic rate finance charge during the Class Period) is entirely fair and adequate. Accordingly, the objection as to the amount of the finance charge credit is overruled.

Other individuals object because they believe Class Members will receive minuscule recoveries. In fact, the evidence presented by the parties shows that the amounts paid to individual class members is significant, ranging from $0.38 to $319 per Class Member. In addition, based on claims processed as of January 18, Defendants will be required to provide, among other monetary benefits, in excess of 166,000 Late Fee Credits (estimated at $29 each) and in excess of 58,000 Reprice Credits (estimated at $58 each). Thus, contrary to the objections, many Settlement Class Members will receive significant recoveries. Regardless if some believe these are small dollar amounts, the evidence before the Court is that Class Members are receiving the amount they were damaged. Hence, this objection lacks merit and is overruled.

■ A few Class Members object because they believe the Settlement does not sufficiently punish Defendants, or because Defendants do not admit liability as part of the Settlement. Punitive damages are generally not appropriate in measuring the fairness of a proposed class action settlement. *See, e.g., Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 70 (D.Mass.1997) ("the fact that [the defendant] is not 'sufficiently punished' is not itself a reason for finding the

settlement unfair"); *In re American Family Enterps.*, No. 99–41774(RG), 256 B.R. 377, 424–25 (D.N.J.2000), quoting *In re Greenman Sec. Litig.*, 622 F.Supp. 1430, 1441 (S.D.Fla.1985), *rev'd on other grounds*, 829 F.2d 1539 (11th Cir.1987) (punitive recovery "should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed before leaving the station"). Moreover, the Truth in Lending Act caps damages in a class action at the lesser of either $500,000 or 1% of the defendants' net worth. 15 U.S.C. § 1640(a)(2)(B). Nor does the absence of an admission of liability make the Settlement unfair. *See, e.g., Alliance to End Repression*, 561 F.Supp. at 554 ("It would defeat an important purpose of [a class action] settlement, and therefore render settlements less attractive to the parties, if the settlement agreement were required to include admissions of wrongdoing by defendants or if the court itself made such findings in connection with a proposed [class action] settlement."). Accordingly, the objections to the absence of punitive damages or an admission of liability are overruled.

Other objectors complain that the Settlement fails to address various claims not asserted in the Amended Class Action Complaint, or that pre–1998 claims are not included. The pleadings frame the case, and, therefore, it is not surprising, nor does it render the settlement unfair, that claims not included in the lawsuit were not included in the Settlement Agreement. There was no evidence adduced in this lawsuit that the alleged payment processing irregularities occurred prior to January 1, 1998, nor were such claims asserted by the Representative Plaintiff. Accordingly, these objections are meritless and are overruled.

■ Several objectors criticize what they characterize as a reversion of settlement funds to Defendants in the Settlement. Under the Settlement Agreement, the parties agreed that any undistributed settlement funds (except for up to $100,000 for a cy pres fund) will be retained by Defendants as partial reimbursement for the costs of Settlement, Notice, and related expenses. Courts have broad discretion in distributing unclaimed class action funds, and where the parties agree on the distribution of unclaimed class funds, the court should defer to that method of distribution. *See, e.g.,* NEWBERG ON CLASS ACTIONS, § 10.15 (3rd Ed.1992); *Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 815–16 (5th Cir.1989) (where parties agree to distribution of unclaimed class fund, and agreed distribution is equitable, the court will defer to such agreement); *Van Gemert v. Boeing Co.*, 739 F.2d 730, 737 (2nd Cir.1984) (court approved special master's plan to revert unclaimed funds to defendants as that plan best preserved the "superior equitable interests of the non-claiming class members"; court rejected plaintiffs' proposal for pro rata distribution to class members).

The reversion is justified for other reasons. As an initial matter, the objection to the reversion is ill-founded given the ability of most Settlement Class Members to receive nearly 100% recoveries. To give Settlement Class Members more than the amounts they were allegedly damaged would constitute an unfair windfall.

Also, the parties presented credible and unrefuted evidence that FUSA does not have records allowing it to determine exactly how much it received as a result of the alleged payment processing errors, and that as a result, FUSA arrived at estimates of the maximum possible economic impact of payment processing issues that gave rise to this lawsuit. That analysis lead to the creation of the various "pools" for the categories of recovery under the Settlement. However, these pools do not represent the actual amount of money that FUSA allegedly improperly obtained from cardmembers, but instead represent the maximum that FUSA has agreed to pay Settlement Class Members for the specific benefits available under the Settlement. The evidence also strongly suggests that the pools are overstated because FUSA has previously provided hundreds of thousands of late fee credits to cardmembers who contacted FUSA directly and requested a credit for a late fee. In that regard, while the pools established by FUSA represent the theoretical maximum amount that FUSA

could have received as a result of the alleged payment processing irregularities, FUSA has previously provided refunds to hundreds of thousands or more cardmembers outside of this Settlement for those same alleged payment processing irregularities. Because the Settlement Agreement allows Defendants, in some instances, to reduce recoveries to Settlement Class Members if the Settlement Class Members already received a "Late Fee Adjustment" from FUSA, the pools likely overstate the amount of benefits that could be claimed because of the many Late Fee Adjustments previously provided to Settlement Class Members. This fact alone justifies the reversion.

Finally, the reversion is justified given the millions of dollars expended by Defendants in funding the Notice program, agreeing to pay Class Counsel's fees and expenses, investigating the issues giving rise to this lawsuit, and in administrating the settlement. For all of these reasons, the objections to the reversion are all overruled.

A few objectors complain that the release provided by Settlement Class Members is too broad. That is not the case. There is nothing unusual or unfair about Defendants' interest in finality and their desire to be released from Class Member's claims, particularly after providing the class with total benefits of up to $50 million. In any event, the release contained in the Settlement Agreement is not overly broad. *See, e.g., Seiden v. Nicholson,* 72 F.R.D. 201, 208 (N.D.Ill.1976) (approving release in class settlement that essentially "permanently barred and enjoined [the class] from instituting or prosecuting, either directly or representatively, any other action, claim or proceeding against the named defendants, ... which has been or could have been, asserted arising from or relating to the matters alleged in the complaint"); *In re Nasdaq Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 482 (S.D.N.Y. 1998) (approving release in class action settlement and noting that a "release of claims may refer to all claims raised in a pending action, or it may refer to all claims, both potential and actual, that may have been raised in the pending action"). Accordingly,

the objection to the scope of the release is overruled.

■ Although the form and content of the class notice are committed to the sound discretion of the court, *(In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 299 (3d Cir.1998)), some objectors have complained about the form and content of the Class Notice. These objections can be summarized as follows: (a) the Notice is not sufficiently understandable; (b) the Notice does not provide a minimum description of the litigation, including the facts of the case, the actual size of the Settlement Class, the exact amount of the damages allegedly sustained by the Class, and the methodology for calculating damages; (c) the Notice does not direct Settlement Class Members to a website or phone number where information about the lawsuit could be easily obtained; (d) the Class Notice does not address claims that are not part of this litigation; and (e) the Class Notice was not received by a substantial number of class members according to one alleged Settlement ·Class Member.

The Court previously approved the form and content of the Class Notice, and has determined that the notice campaign in this lawsuit exceeded the requirements of due process and F.R.C.P. 23. Under F.R.C.P. 23(c)(2), members of the Settlement Class (which was certified under F.R.C.P. 23(b)(3)) are entitled to the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Additionally, Rule 23(e) mandates that notice of compromise of a class action must "be given to all members of the class in such manner as the court directs." Neither Rule 23 nor due process require "receipt of actual notice by all class members;" rather, "notice should be mailed to the last known addresses of those who can be identified and publication used to notify others ...." 2 NEWBERG ON CLASS ACTIONS, § 8.02 (3rd Ed.1992) (citing MANUAL FOR COMPLEX LITIGATION, SECOND ¶ 30.211 (2nd Ed.1985)); *see also Burns v. Elrod,* 757 F.2d 151, 154 (7th Cir.1985) (rejecting objection that notice mailed to 10 year old addresses and published in press violated due process noting "Rule 23 does not require

defendants to exhaust every conceivable method of identification"); *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C.Cir.1992) ("due process clause does not amount to a guarantee of notice to a class member", thus notice mailed without apartment number and with incorrect zip code did not violate due process). Moreover, compliance with the notice requirements of F.R.C.P. 23(c)(2) satisfies due process because "the adoption of the rule is itself a prima facie judgment that procedures consonant with its language are constitutional." *Newberg, supra* § 8.04. Finally, F.R.C.P. 23 gives the Court broad discretion in fashioning the notice program in each particular case. *Id.* at § 8.03. *See also Reynolds v. National Football League*, 584 F.2d 280, 285 (8th Cir.1978) (district court's discretion in fashioning notice "is limited only by the broad 'reasonableness' standard imposed by due process").

■ The Class Notice was mailed to the last known address of all Class Members identified through reasonable effort by FUSA. The parties believe they identified and mailed Class Notice to all Settlement Class Members. In addition to mailing the Class Notice to nearly 18.5 million Settlement Class Members, FUSA also published the Summary Notice on three separate days in a nationally published newspaper, *USA Today*, and further published the Class Notice and other pertinent information on the Internet.

Therefore, the Court finds that the Class Notice fully complies with the specific notice requirements imposed by F.R.C.P. 23(c)(2)(A), (B), and (C). As required by F.R.C.P. 23(c)(2)(A) the Class Notice clearly states in bold font on the very first page that "You will be part of the Settlement *unless* you request to be excluded," and informs Class Members that January 12, 2001 is the last day to opt out. As required by F.R.C.P. 23(c)(2)(B), the Notice informs Class Members that any Settlement Class Member who fails to opt out "will be bound by any judgment entered in this lawsuit." As required by F.R.C.P. 23(c)(2)(C), the Notice also states that any Settlement Class Member

"may object to the terms of the Settlement" or "obtain [their] own counsel."

Aside from these requirements, a notice satisfies F.R.C.P. 23(c)(2), F.R.C.P. 23(e), due process, and binds all members of the class if it:

1. describes the essential terms of the settlement;

2. discloses any special benefits or incentives to the class representatives;

3. provides information regarding attorneys' fees;

4. indicates the time and place of the hearing to consider approval of the settlement, and the method for objection to and/or opting out of the settlement;

5. explains the procedures for allocating and distributing settlement funds; and

6. prominently displays the address of class counsel and the procedure for making inquiries.

MANUAL FOR COMPLEX LITIGATION THIRD, ¶ 30.212 (3rd Ed.1995). *See, e.g., Air Lines Stewards and Stewardesses Ass'n Local 550 v. American Airlines*, 455 F.2d 101, 108 (7th Cir.1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *accord Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir.1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

As stated above, this Court has already approved the Class Notice and has found that it satisfies each of the elements set forth above. The Notice identifies the lawsuit by docket number and case caption, describes the litigation, and gives a summary of the available benefit. The Notice also discloses Class Counsel's intention to seek an incentive award for the Representative Plaintiff (to be paid solely out of Class Counsel's fees), and discloses the maximum amount of attorney's fees that will be sought by Class Counsel. It further informs the Class that the Class will not be responsible for paying Class Counsel's fees. The Class Notice also prominently indicates the time and place of the hearing to consider final approval of the Settlement, and

explains to Class Members the procedure for opting out of the Class or objecting to the Settlement. The Notice also describes in detail the procedures for allocating and distributing the Settlement proceeds, including a thorough description of the various procedures established for obtaining such benefits. Finally, the Notice displays the name and address of Class Counsel and informs Settlement Class Members of the procedure for making inquiries of Class Counsel. Accordingly, the Notice clearly meets the requirements imposed by F.R.C.P. 23(c)(2) and F.R.C.P. 23(e), and constitutes the "best notice practicable under the circumstances" of this lawsuit. Therefore, the objections to the Notice are without merit. Nevertheless, the Court will address the various objections to the Notice.

Some objectors claim the Class Notice is confusing or difficult to understand. To the contrary, the Notice is presented in an easy to read form and is easily understandable by the layperson. To the extent a Settlement Class Member has a question after reading the Class Notice, he or she is directed to call a toll-free number where the Class Member can obtain answers to commonly asked questions though an interactive menu system. Class Members were also directed to the FUSA settlement information website which contained, among other things, a copy of the Settlement Agreement. Finally, to the extent a Settlement Class Member still had questions about the Settlement, Section 9 of the Notice invites Settlement Class Members to direct written questions to Class Counsel. *See, e.g., Boggess v. Hogan,* 410 F.Supp. 433, 441 (N.D.Ill.1975) ("[t]here is no authority for the proposition that the notices explore all of the underlying issues in the lawsuit. Ambiguities regarding the substantive aspects of the litigation could be resolved by examining the pleadings on file with the clerk").

■ The next issue raised by objectors is that the Class Notice does not give the minimum description of the litigation, including the facts of the case, the size of the Settlement Class, the value of damages, the merits of the claims, the nature and amount of discovery, the maximum potential recovery for the Class, and the methodology for determining and calculating damages. However, none of the items complained of are required by the notice requirements set out in F.R.C.P. 23 or due process. *Boggess,* 410 F.Supp. at 441; *see also Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1153 (8th Cir.1999) (Notice provided "a reasonable summary of the status of the litigation, and class members could easily acquire more detailed information, including data on potential individual awards through the telephone number that was provided. Due process requires no more"); *Maher v. Zapata Corp.,* 714 F.2d 436, 452 (5th Cir.1983) ("By telling the shareholders that the descriptions were 'only summaries' and the court files were open for inspection, the notice implicitly invited them to conduct further investigation, if they so desired, on the basis for, the background of, and the legal implications of the settlement"); *Grunin,* 513 F.2d at 122 ("Class members are not expected to rely upon the notices as a complete source of settlement information"). The Notice also prominently states that it "is intended only as a summary of the Lawsuit and the Settlement," and that Settlement Class Members may inspect the pleadings and other relevant documents, including the Settlement Agreement, at the Courthouse. Thus, these objections are overruled.

■ Objectors also claim that the Notice is insufficient because all of the court pleadings or other information (such as cardmember payment records) are not available over the Internet or over the telephone. There is no requirement under due process or the federal rules requiring dissemination of such information over the Internet or the telephone. Rather, all that is required by F.R.C.P. 23 is that Notice be provided to the class by the most practicable means available, which in this case was first class mail. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (The procedure "where a fully descriptive notice is sent by first-class mail to each class member, with an explanation of the right to 'opt-out,' satisfies due process"); *see also Zimmer Paper Prods. Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 90 (3rd Cir.1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy

the notice requirements of both F.R.C.P. 23 and the due process clause"). In addition, Settlement Class Members were provided with a toll-free number which was established to answer commonly asked questions though an interactive menu system, and were also directed to the FUSA settlement information website which contained, among other things, a copy of the Settlement Agreement. Settlement Class Members were also given the option of directing questions about the Settlement to Class Counsel. *See In re Synthroid Mktg. Litig.*, 110 F.Supp.2d 676, 680 (N.D.Ill.2000) ("direct mailings, toll-free 1–800 numbers, websites, and the attorney call center are reasonable steps" to notify class). Accordingly, these objections are overruled.

■ Another objector attacks the Notice because it does not disclose the availability of remedies under state laws. However, the objector fails to identify any additional specific remedies that would be applicable in this case. Regardless, this objection lacks merit because there is no principle of law that requires a settlement notice to list every conceivable claim or cause of action that could have been asserted in the litigation. *See Boggess*, 410 F.Supp. at 442 (rejecting objections that failing to give damage estimate and failing to give formula used for calculating individual awards violated due process). Finally, the Notice states that it "is intended only as a summary of the Lawsuit and the Settlement," and that Settlement Class Members may inspect the pleadings and other relevant documents, including the Settlement Agreement, at the Courthouse. *See Petrovic*, 200 F.3d at 1153; *Maher*, 714 F.2d at 452; *Grunin*, 513 F.2d at 122.

A handful of the Settlement Class Members have objected to the Proof of Claim process. These objections generally fall into the following sub-categories: (a) FUSA allegedly has the records regarding late fees and finance charges and should be required to determine which of its cardmembers are entitled to payments; (b) the claim process is burdensome and is designed to discourage participation by Settlement Class Members; and (c) it is too onerous or impossible for Settlement Class Members to establish their

claims. Upon examination, these objections are all without merit.

The objection to the proof of claim process wrongly assumes that FUSA keeps records in the ordinary course of its business that would permit FUSA to determine the time of day that FUSA cardmembers' payments were received during the Class Period. The evidence presented to the Court indicates that other than so-called multipayments and the relatively small percentage of Settlement Class Members who were identified based on contemporaneous quality audits, FUSA cannot determine which cardmembers' payments were affected by the alleged payment processing irregularities. As for those Settlement Class Members for whom FUSA has available records, FUSA is providing direct benefits under the Settlement and is not requiring a Proof of Claim from such Settlement Class Members. Aside from such identified cardmembers, FUSA can only determine which of its cardmembers may have been affected by the alleged payment processing irregularities based on its assessment of finance charges and/or late fees on the cardmembers. Therefore FUSA is accepting as true, via the Proof of Claim, all Class Members' claims of having timely mailed payments, and will examine each payment previously made by a claiming Class Member during the Class Period to determine if a one or two day delay in processing would have caused any adverse financial impact to the Class Member. For these reasons, the Court concludes the Settlement does not improperly require a Proof of Claim process.

Still other objectors claim that the Settlement is unfair because FUSA should bear the burden of establishing which of the Settlement Class Members are entitled to reimbursement. These objections ignore the rule that a plaintiff in a civil lawsuit bears the burden of proving liability and damages in his or her case. *See, e.g., Sprogis v. United Air Lines*, 517 F.2d 387, 392 (7th Cir.1975) (plaintiffs in civil actions bear the burden of proving their damages); and *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 206 (5th Cir.2000). Class action status does not alter this basic principle. Thus, it is not a valid objection that Defen-

dants should bear the burden of proving which Settlement Class Members are or are not entitled to reimbursement.

The objections that the claim form is too burdensome or that it is impossible for Settlement Class Members to succeed in establishing their claims are also without merit. Settlement Class Members wishing to seek reimbursement for Eligible Late Fees need only check a box on the Proof of Claim form and sign their name attesting, under penalty of perjury, that "to the best of [their] knowledge, information and belief, [they] followed the payment instructions contained in [their] statement[s] and timely mailed [their] payment(s) to First USA in Louisville, Kentucky or Atlanta, Georgia and [were] charged a late fee(s) between January 1, 1998 and August 31, 1999." Settlement Class Members are not required to submit any documentation with their claim, such as canceled checks, copies of account statements or anything else other than a signed Proof of Claim. To eliminate any burden, there is no requirement that the form be notarized. Therefore, the claim form is hardly burdensome.

The requirement of an affirmation on the claim form, under penalty of perjury, from the Settlement Class Member seeking reimbursement for an Eligible Late Fee was appropriate and not objectionable. Notarization of claim forms is routinely required in class action settlements "to assure that the fund [is] share[d] among proper and deserving claimants," and here only an affirmation was required from Class Members. *In re Armored Car Antitrust Litig.*, No. 78–139A, 1979 WL 1688 (N.D.Ga. Aug.13, 1979). Therefore, this objection is overruled.

The Proof of Claim form is also the means to be used by former FUSA cardmembers who elect to receive the $0.75 Finance Charge Credit available to former cardmembers who are not entitled to any other monetary relief under the Settlement. Once again, the Claim form does not impose any burden on former cardmembers seeking to make that election and does not require Settlement Class Members to provide any documentation to FUSA. Accordingly, any objec-

tions to that part of the claim process are overruled.

A few objectors attack the fairness of the Proof of Class Membership process. The uncontroverted evidence establishes that the class identification procedures employed by FUSA should capture 100% of all Settlement Class Members. Even so, FUSA published the Summary Notice in a nationally published newspaper, *USA Today*, for three days. Furthermore, the Settlement provides that individuals wishing to be included in the Settlement Class may submit their name, address, account number, and social security number to FUSA. FUSA has agreed to determine whether the individual submitting a Proof of Class Membership form meets the Class Definition in the Settlement Agreement. Even if the individual submitting the form does not provide all of the requested information (such as a social security number or account number), FUSA has agreed to attempt to determine class membership. If a class membership claim is denied, FUSA has agreed to provide notice to such individuals and provide them with 14 days to cure the deficiency, if possible, by supplying requisite proof or additional information (such as an account number) to FUSA. Such a process is patently fair, particularly because an individual who is unable to establish that he or she is in the Settlement Class would never be able to carry their burden of proof in a civil lawsuit against Defendants for the claims asserted in this lawsuit. Accordingly, objections to the proof of class membership process are overruled.

Another objector claims that the amount of discovery was insufficient in this lawsuit. As already discussed, the Court has concluded that the amount of discovery was more than sufficient and this objection is overruled. Any objection that Class Counsel's investigation included informal discovery (in addition to formal discovery) is no basis for objection. *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir.1981) ("formal discovery [is not] a necessary ticket to the bargaining table").

All additional objections were considered by the Court, are minor and do not merit

discussion. Therefore they are overruled.[3]

## ORDER AND FINAL JUDGMENT

After due deliberation, this Court hereby FINDS, CONCLUDES, ADJUDGES, and DECREES that:

1. Plaintiffs' and Defendants' motions for final approval of the class action settlement is **GRANTED** (Docs. 79 and 81).

2. This Order and Final Judgment incorporates herein the foregoing discussion and analysis by the Court, as well as the Class Action Settlement Agreement which includes the November 20, 2000 Release and all exhibits, documents, and previous orders of this Court incorporated therein. The capitalized terms used in this Order and Final Judgment shall have the same meaning as those in the Settlement Agreement.

3. On November 21, 2000, this Court conditionally certified, for purposes of settlement only, the Settlement Class defined in that Order. The Court now confirms that all of the requirements of Rule 23 of the Federal Rules of Civil Procedure for certification of a Settlement Class, which were set forth in the Court's November 21, 2000 Order have been met. Accordingly, the Settlement Class is finally certified, consisting of the following persons:

> All consumers who have or have had one or more credit card account(s) owned by First USA Bank, N.A. ("FUSA"), who had credit card payments processed in payment facilities operated by a FUSA third-party vendor in Atlanta, Georgia, or Louisville, Kentucky, from January 1, 1998, through August 31, 1999, as determined by FUSA's records, and who were assessed a periodic rate finance charge and/or late fee by FUSA during that period. Excluded from the class is the trial judge.

4. This Order is binding on all Settlement Class Members, excluding all persons who timely submitted a valid Request For Exclusion from the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, who are not bound by any terms of this Judgment and shall not participate in the proceeds of the Settlement or receive any benefits under it. (A list of the opt out persons shall be filed with the Court by Class Counsel by Wednesday, February 28, 2001 under seal because it contains credit card numbers of those who opted out.)

5. The Settlement Agreement has been entered into in good faith following arms'-length negotiations, and is non-collusive. The proposed Settlement of the Litigation on the terms and conditions set forth in the Settlement Agreement is fair, reasonable, adequate, in the best interest of the Settlement Class, and should be approved.

6. The Notice provided for and given to the Settlement Class constitutes the best notice practicable under the circumstances and is in full compliance with the notice requirements of due process and F.R.C.P. 23. As attested by the Affidavits submitted by the parties, the Notice provisions set out in the November 21, 2000 Order have been accomplished.

7. For the reasons set forth above, the Settlement Agreement and the proposed Settlement are hereby approved and shall be consummated in accordance with the terms and provisions of the Settlement Agreement.

8. The Court, having considered all of the objections submitted to it including those objections that were untimely filed, overrules those objections for the reasons noted above.

9. The Litigation is dismissed on the merits, with prejudice and without costs to any party, except as provided in the Settlement Agreement. Each and every Settlement Class Member who has not excluded himself from the Settlement Class hereby releases Defendants from all claims, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated that, as of the date that the final judgment is entered: (i) arise out of or are related in any way to any or all of the acts, omissions, facts, matters, transactions, or occurrences that were directly or indirectly alleged, asserted, described, set forth, or referred to in the Action (including but not

---

**3.** The Court addresses the objections to class counsel's fees separately in its Order regarding Class Counsel's Motion for Award of Attorney's Fees, Costs and Incentive Awards.

limited to claims for alleged violations of TILA and all statutory penalties thereunder); or (ii) are, were, or could have arisen out of or been related in any way to Defendants' failure (or alleged failure) to obtain, receive, process, and/or credit any payments properly and/or in a timely fashion and/or as of the proper date and/or cut-off time during the Class Period (the "Settled Claims").

10. By participating in the Settlement, neither FUSA nor Settlement Class Members waive their rights under any FUSA cardmember agreement to pursue arbitrations involving claims other than the Settled Claims.

11. The terms of the Settlement Agreement, including the release of the Settled Claims, and this Order and Final Judgment shall forever be binding on, and shall have res judicata and preclusive effect in all pending and future lawsuits maintained by or on behalf of, the plaintiff or any other member of the Settlement Class, as well as their heirs, executors and administrators, successors and assigns, or anyone on their behalf.

12. All Settlement Class Members are barred and enjoined from instituting, prosecuting or continuing to prosecute any claims that are Settled Claims against any of the Defendants or any of their present or former officers, directors, shareholders, parent companies, employees, accountants, attorneys, representatives, insurers, subsidiaries, affiliated companies, divisions, successors, predecessors-in-interest, heirs, agents and assigns.

13. Each Settlement Class Member shall be deemed to have relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits of any state or federal law, rule, or regulation that purports to restrict the scope of a release to claims that the party knows or suspects to exist in his favor, regardless of whether knowledge of such a claim would have materially affected his settlement with the other party.

14. The Settlement Agreement, Order and Final Judgment, and all papers related to the Settlement are not, and shall not in any event be, an admission by Defendants, or any other person, of any liability or wrongdoing whatsoever, and shall not be offered as evidence of any claimed liability or wrongdoing whatsoever in this or any future proceeding.

15. The parties are directed to carry out their obligations under the Settlement Agreement.

16. Pursuant to Section 8.1(f) of the Settlement Agreement, Defendants are directed to contribute the undistributed Finance Charge Credits, up to a maximum of $100,000 to the Land of Lincoln Legal Assistance Foundation, Inc. to be used by the East St. Louis office for legal services to promote consumer rights and education.

17. Any other motion pending in the above captioned matter before this Court other than Plaintiff's Counsel's motion for fees, is denied without prejudice.

18. Without affecting the finality of this Order and Final Judgment, this Court reserves continuing and exclusive jurisdiction over the parties to the Settlement Agreement, including the Defendants, and all Settlement Class Members, to administer, supervise, construe, and enforce the Settlement Agreement and this Order and Final Judgment in accordance with their terms for the mutual benefit of the parties and the Settlement Class. The Court retains continuing and exclusive jurisdiction for purposes of, among other things, the payment of awards to Settlement Class Members, claims administration, the distribution of settlement funds and payment of related fees and expenses until the effectuation of the settlement in accordance with the Settlement Agreement has been accomplished.

**IT IS SO ORDERED.**