75 F.3d 1191
 Aaron E. ISBY, Sidney Wilson, Guila Ifoma f/k/a Robert
Henson, Jerry Stahl, and Lokmar Abdul-Wadood,
Plaintiffs-Appellants,
and
Paul Komyatti, Jr., William Sampley, Mark S. Douglas, et
al., Plaintiffs-Appellees,
v.
Evan BAYH, in his individual and official capacity as
Governor of the State of Indiana; James E. Aiken, in his
individual and official capacity as Commissioner of the
Indiana Department of Corrections; Norman G. Owens, in his
individual and official capacity as Director of the
Classification Division of the Indiana Department of
Corrections; John Nunn, in his individual and official
capacity as Deputy Commissioner of Operations of the Indiana
Department of Corrections; and, Charles E. Wright, in his
individual and official capacity as Director of the Maximum
Control Complex of the Indiana Department of Corrections,
Defendants-Appellees.
 Nos. 94-1400, 94-1481, 94-1493 and 94-1494.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 14, 1995.
Decided Feb. 5, 1996.
 
 Appeals from the United States District Court for the Northern District of Indiana, South Bend Division. No. 92 C 429--Allen Sharp, Chief Judge.
 
 
 1
 Robert J. Palmer, Scott Hardy, Sheila Buckman, Law Students, argued, May, Oberfell & Lorber, South Bend, IN, Richard A. Waples, Indianapolis, IN, for Aaron E. Isby.
 
 
 2
 Hamid R. Kashani (argued), Indianapolis, IN, for Paul Komyatti, Jr., William Sampley, Mark S. Douglas.
 
 
 3
 Wayne E. Uhl (argued), Pamela Carter, Office of the Attorney General, Indianapolis, IN, for Evan Bayh, James E. Aiken, Norman G. Owens, John Nunn, Charles E. Wright.
 
 
 4
 Robert J. Palmer, Scott Hardy, Sheila Buckman, Law Students, argued, May, Oberfell & Lorber, South Bend, IN, for Sidney Wilson, Guila Ifoma, Jerry Stahl, Lokmar Yazid Abdul-Wadood.
 
 
 5
 Jerry Stahl, Indiana State Prison, Michigan City, IN, pro se.
 
 
 6
 Before CUMMINGS, FLAUM, and ROVNER, Circuit Judges.
 
 
 7
 ILANA DIAMOND ROVNER, Circuit Judge.
 
 
 8
 Plaintiffs are a class of prisoners at the Maximum Control Complex ("MCC"), a Westville, Indiana correctional facility. They brought this action to challenge the legality of their assignment to the MCC as well as the conditions of their confinement. They asserted violations of Indiana statutes, the Indiana Constitution and the United States Constitution. After lengthy negotiations, a settlement was reached as to the injunctive relief sought by plaintiffs. A magistrate judge recommended approval of the settlement and the district court agreed, approving the settlement in an order entered February 11, 1994. See Taifa v. Bayh, 846 F.Supp. 723 (N.D.Ind.1994). Five prisoners ("objecting members") appeal from this order, arguing that the district court abused its discretion in approving the settlement. We disagree, however, and accordingly affirm the district court's February 11, 1994 order approving the settlement.
 
 I.
 
 9
 Plaintiffs filed this action in Indiana state court, but defendants thereafter removed it to federal district court where the court certified the case as a class action "for purposes of injunctive relief" pursuant to Fed.R.Civ.P. 23(b)(2). As certified, the class includes "all persons who, as of May 4, 1992, and thereafter in the future, are confined or will be confined in the Maximum Control Complex in Westville, Indiana." Plaintiffs' state law claims were subsequently remanded to state court.
 
 
 10
 When the MCC opened in 1991, the Indiana Department of Corrections ("DOC") began to assign to it certain prisoners previously committed to other Indiana correctional institutions. In their complaint, plaintiffs characterized the MCC as a "supermaximum security institution" and complained that the classification of prisoners as in need of "supermaximum" security was not authorized under Indiana law. Plaintiffs further alleged that the DOC violated state statutory requirements pertaining to administrative and disciplinary segregation by administratively subjecting prisoners to "long-term solitary confinement." Moreover, plaintiffs attacked the admissions procedures and criteria for transfer to the MCC as unconstitutionally vague, subjective and discretionary under the Indiana Constitution.
 
 
 11
 Plaintiffs also challenged many aspects of the conditions of their confinement at the MCC. The complaint alleged that defendants implemented a "program" at the MCC that subjected prisoners to unlawful long-term solitary confinement, sensory deprivation, arbitrary and irrational rules, and physical abuse. Plaintiffs additionally alleged unlawful denial of visitors and medical and psychiatric care, as well as the deprivation of educational, vocational, recreational, and other rehabilitative programs. Plaintiffs further alleged that this "program" at the MCC constituted a "punitive segregation scheme" in violation of state statutes, the Indiana Constitution as well as the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
 
 
 12
 In their claims for relief, plaintiffs requested that defendants be enjoined from further violations of state and federal laws, that the prisoners currently incarcerated at the MCC be returned to the general population of the correctional institutions to which they were assigned prior to their transfer to the MCC, and that the defendants be prohibited from assigning prisoners to the MCC in the future.
 
 
 13
 Prior to issuance of the report and recommendation, the magistrate judge participated in numerous settlement conferences, held a preliminary hearing at the MCC on February 1, 1993 to obtain the views and comments of prisoner representatives, reviewed numerous comments, statements and objections filed with the court, and, conducted a settlement hearing on October 12, 1993 at which several prisoners testified. See Taifa, 846 F.Supp. at 725.
 
 
 14
 Subsequently, the magistrate judge granted a joint motion for approval of a proposed notice of settlement. On November 5, 1993, the notice of settlement, an "Agreed Entry Support/Opposition Form", and a complete copy of the agreed entry containing the terms of the settlement with all attachments was distributed to each of the approximately two hundred prisoners confined at the MCC on that date.[1] The notice of settlement contained a summary of the terms of the agreed entry and informed members of the plaintiff class that objections, if any, to the proposed settlement must be filed within twenty days.[2] See Fed.R.Civ.P. 23(e). The record indicates that sixty-eight out of approximately two hundred class members responded. Of those, forty-two approved the settlement, while twenty-six objected.
 
 
 15
 The agreed entry approved by the court is a fifty-one page document that addresses plaintiffs' various claims, including: assignment to and from the MCC, MCC conditions, use of force policy, medical care, access to legal materials and assistance, educational and substance abuse programs, disciplinary restrictions, and prisoners' grievances. See Taifa, 846 F.Supp. at 726.
 
 
 16
 The agreed entry establishes criteria to govern the assignment of prisoners to the MCC,[3] and provides that prisoners must be transferred to another institution after a specified period of time, subject to certain conditions. The settlement requires that prisoners be transferred out of the MCC if they earn either twenty-four continuous vested months or a total of thirty-six vested months.[4]
 
 
 17
 The settlement provides for a commissary, expands access to radio and television, increases visitation and telephone rights, makes more reading materials available and expands recreational opportunities, allows prisoners to have more personal property and greater access to items of personal hygiene, improves the bedding material assigned to prisoners, decreases the intensity of twenty-four hour lights in the cells, limits the use of force by DOC personnel, expands medical care, provides a comprehensive law library with improved prisoner access, provides educational opportunities and substance abuse programs when necessary, and improves the prisoner grievance procedures.
 
 
 18
 Also included is a mechanism for resolving disputes concerning the implementation and interpretation of its terms along with detailed monitoring and reporting requirements. The district court retained jurisdiction and supervision of the case for a period of two years subject to extension under specified conditions.
 
 II.
 
 19
 Defendants initially challenge our jurisdiction over these appeals on a variety of grounds.[5] First, they argue that the approval of the agreed entry was not the granting or refusal of an injunction appealable under 28 U.S.C. § 1292(a)(1). They assert that the interlocutory order appealed from neither compelled the objecting members to do anything nor refused their request for an injunction. They then argue that, to the extent the order had the effect of refusing an injunction, it did not subject the objecting members to irreparable harm, and was, therefore, not appealable. Objecting members assert that the order granted in part and denied in part the plaintiffs' request for an injunction, thereby supporting appellate jurisdiction under 28 U.S.C. § 1292(a)(1). They take the position that they need not establish irreparable harm, but that if they do, irreparable harm is readily apparent.
 
 
 20
 Second, Defendants urge this court to clarify its holding in Research Corp. v. Asgrow Seed Co., 425 F.2d 1059 (7th Cir.1970), and embrace a rule, adopted in other circuits,[6] that would require unnamed class members to formally intervene before they would have standing to appeal the approval of a class action settlement. They point out that only one of the unnamed class members who now appeals the approval of the settlement sought to intervene, and he did not appeal the denial of his motion to intervene. Defendants further contend that the one named class member who did appeal lost his named plaintiff status when he filed his notice of appeal while still represented by class counsel. For their part, objecting members argue that under Research Corp., the unnamed class members properly objected to the settlement, thereby preserving their standing to appeal its approval.
 
 
 21
 Third, defendants assert that two of the objecting members failed to file objections to the magistrate's report and recommendation and thereby waived any right to appeal they may have had. Objecting members respond that noncompliance with the rule requiring the filing of objections is not jurisdictional and should not be utilized to defeat the "ends of justice."
 
 
 22
 These jurisdictional issues are numerous, with some potentially complicated, and most will affect some but not all of the objecting members. Assuming jurisdiction, however, the merits of these appeals are simple, straightforward and easily resolved in favor of the parties defending the settlement. Thus, regardless of whether we were to dismiss the appeals for lack of jurisdiction or to reach the merits of the appeals, the settlement would stand. Although jurisdictional issues are normally resolved prior to a determination of the merits, under the circumstances here, we may disregard potentially difficult jurisdictional issues and proceed directly to the merits where there is no practical difference in the outcome. See e.g., Norton v. Mathews, 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976); Safeco Life Insurance Company v. Musser, 65 F.3d 647, 650 (7th Cir.1995); Rekhi v. Wildwood Industries, Inc., 61 F.3d 1313, 1316 (7th Cir.1995); Tisza v. Communications Workers of America, 953 F.2d 298, 300 (7th Cir.1992); United States v. Parcel of Land, 928 F.2d 1, 4 (1st Cir.1991); Browning-Ferris Industries of South Jersey, Inc. v. Muszynski, 899 F.2d 151, 154-60 (2d Cir.1990). We believe it is prudent to do so here.
 
 III.
 
 23
 Federal courts naturally favor the settlement of class action litigation. E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 888-89 (7th Cir.1985), cert. denied, 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986); Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1013 (7th Cir.1980); Armstrong v. Board of School Directors, Etc., 616 F.2d 305, 312-13 (7th Cir.1980). Although such settlements must be approved by the district court, its inquiry is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate. Hiram Walker, 768 F.2d at 889.
 
 
 24
 Our appellate review is even more narrow, as we review the determination of the district court only for an abuse of discretion. Id. at 890. As we engage in this limited review, we are mindful that the district courts have been admonished "to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights," a directive that applies to our own inquiry as well. Id. at 889. See also Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir.1979); Bryan v. Pittsburgh Plate Glass Co. (PPG Industries, Inc.), 494 F.2d 799, 801 (3d Cir.1974), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). Our focus, then, is upon "the general principles governing approval of class action settlements" and not upon the "substantive law governing the claims asserted in the litigation." Armstrong, 616 F.2d at 315.
 
 
 25
 Where, as here, constitutional claims are asserted, we recognize that public interests may potentially conflict with the desire of the parties to settle their dispute. Id. at 319. The presence of constitutional claims does not, however, prevent us from applying the principles that guide our review which allow "ample room for settlement and compromise." Id. We must, however, "apply these principles with particular care and state [our] reasoning with particular clarity." Id.
 
 
 26
 In addition, we cannot approve a class action settlement "which either initiates or authorizes the continuation of clearly illegal conduct." Id.; Grunin v. International House of Pancakes, 513 F.2d 114, 123-24 (8th Cir.1975), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). As we apply this principle, however, we are mindful that "the court must not decide unsettled legal questions; any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement before a settlement can be rejected on this basis." Armstrong, 616 F.2d at 320. Moreover, in determining whether to reject a settlement as initiating or authorizing a "clearly illegal or unconstitutional practice, prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule." Id. at 321.
 
 
 27
 Here, objecting members contend that the district court abused its discretion when it approved the settlement because that agreement allegedly contains unlawful provisions. We disagree.
 
 
 28
 Objecting members first argue that the very existence of the MCC is unlawful because Indiana law does not authorize either supermaximum or disciplinary segregation institutions such as the MCC.[7] For their part, the state defendants deny the MCC is a segregation institution of any type and assert that the MCC is simply a high security prison which Indiana is authorized to establish.[8]
 
 
 29
 The issues raised here by objecting members are essentially the same as issues raised by plaintiffs in their complaint. To our knowledge, Indiana courts have not made any determination as to whether the MCC or anything like it is either a "supermaximum" security institution or a "disciplinary segregation institution" and, if so, whether or not the existence of the MCC violates Indiana law. The parties presumably compromised and arrived at their settlement because the law related to these issues is unclear. Of course, as a necessary consequence of settlement, the merits of these issues remain unresolved. We decline the invitation of objecting members to determine those merits. For purposes of our review, it is sufficient to note that we do not find here any illegality appearing as a legal certainty on the face of the settlement. Armstrong, 616 F.2d at 320-21.
 
 
 30
 Objecting members next argue that the settlement violates Indiana law because it permits indefinite segregation.[9] Although objecting members concede that the settlement agreement provides for a classification review after an initial twelve month period of incarceration at the MCC, they overlook the provision that upon approval of the agreed entry the DOC was required to conduct an immediate classification review and reevaluation of all prisoners at the MCC. In our view, there is nothing appearing on the face of the settlement agreement that permits the parties to avoid the annual review requirements of Indiana Code § 11-10-1-6 (1993).[10] In fact, the agreed entry permits the DOC to conduct more frequent reviews at its discretion.
 
 
 31
 Objecting members also claim here that the vested month provisions of the settlement violate both Indiana law and the due process clause of the Fourteenth Amendment. As noted above, the settlement provides that a prisoner will be transferred from the MCC to another institution upon accrual of either twenty-four continuous vested months or a cumulative total of thirty-six vested months. Prior to the settlement, no such mechanism was in place to provide an upper limit to the duration of a prisoner's assignment to the MCC. Objecting members complain that the DOC can take away accumulated vested months according to staff discretion and that prisoners may thereby lose their chance for release in violation of the due process protections afforded by the Fourteenth Amendment. However, the agreed entry provides that prisoners may lose accumulated vested months only as a result of Conduct Adjustment Board ("CAB") convictions, at the discretion of the CAB, and "then only up to the number of months a CAB could otherwise order segregation of the prisoner for the violations under the ADPP."
 
 
 32
 Objecting members challenge the constitutional sufficiency of these procedures because, in their view, they do not afford as much protection as provided by Indiana Code § 35-50-6-5 (1993), which governs the loss of "earned credit time." Objecting members concede that the Indiana Code lacks any reference to "vested months" but analogize to Indiana Code provisions pertaining to the deprivation of "earned credit time". See Indiana Code §§ 11-11-5-3(10) and 35-50-6-5(b) (1993). We note that objecting members fail to cite any Indiana authority for the proposition that "vested months" as contemplated in this settlement are equivalent to "earned credit time." Again, we need not venture into unsettled areas of Indiana law. Armstrong, 616 F.2d at 320-21. To the extent that objecting members implicate the Fourteenth Amendment, we note that the accumulation or loss of "vested months" only affects the length of a prisoner's assignment to the MCC, it has no effect upon the length of the prisoner's sentence or of his commitment to the DOC. In any event, the agreed entry specifies that accumulated vested months can only be taken away after a conviction for disciplinary violations by a conduct adjustment board, presumably upon proper notice and hearing subject to the due process procedural protections sanctioned by Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Recognizing, again, that we do not here determine or reach the merits of objecting members' federal constitutional claim, for our present purposes it cannot be said that the vested month provisions appear, on their face, to be unconstitutional with legal certainty. Armstrong, 616 F.2d at 320-21.
 
 
 33
 We next consider whether the district court abused its discretion when it determined that the settlement was fair, reasonable and adequate. The district court properly recognized that a number of factors have been consistently employed by the district courts to aid them in determining the "fairness" of class action settlements. Taifa, 846 F.Supp. at 726. These include the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement. Hiram Walker, 768 F.2d at 889.
 
 
 34
 Consistent with this approach, we "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness." Armstrong, 616 F.2d at 315. We also consider the facts "in the light most favorable to the settlement." Id.
 
 
 35
 The district court properly recognized that the first factor, the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration. Taifa, 846 F.Supp. at 726. The district court stated its firm belief that plaintiffs' chances for success at trial on the merits were relatively low when compared to what defendants offered in the agreed entry. Id. In support of this belief, the district court noted that one of plaintiffs' "principal concerns" was the assignment of prisoners to the MCC as part of a classification process rather than as the outcome of disciplinary proceedings which afford due process protections. As evidence that plaintiffs' prospects on this issue were not favorable, the district court relied on King v. Fairman, 997 F.2d 259, 262 n. 4 (7th Cir.1993), in which we cited Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), for the proposition that "an inmate has no liberty interest in confinement at any particular state prison and that prison officials may effect discretionary transfers of an inmate without implicating the due process clause, even if the conditions at one prison are substantially worse than another." Taifa, 846 F.Supp. at 726-27. See also Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, (1976). All of these decisions were recognized by the district court as undermining plaintiffs' chances of success on the merits. Taifa, 846 F.Supp. at 727.[11] The district court then observed that despite its doubt that plaintiffs would prevail with their claims regarding their transfer to and indefinite confinement at the MCC, the defendants had agreed both to specific criteria to be utilized for the assignment of prisoners to the MCC and to specific procedures and conditions for transfer from the MCC. Id. Similarly, the district court described plaintiffs' burden of demonstrating that conditions at the MCC violated the Eighth Amendment as "formidable". Id. Counsel for plaintiff class concede that plaintiffs might not have obtained all the relief provided by the agreed entry in a final decree even if they had been successful in their efforts to convince the trial court to conclude that the MCC is a disciplinary segregation institution. The agreed entry provides comprehensive and substantial relief with respect to criteria and procedures for assignment to and transfer from the MCC as well as improvements in prison conditions. Viewed in light of the obstacles to success on the merits, the district court did not abuse its discretion in its consideration of this factor.
 
 
 36
 With regard to the second factor, the district court opined that continuation of the litigation "would require the resolution of many difficult and complex issues," would "entail considerable additional expense," and would "likely involve weeks, perhaps months, of trial time." Taifa, 846 F.Supp. at 727. The court concluded that the settlement represented "an outcome at least comparable, if not far superior, to that which plaintiffs might achieve by proceeding to trial." Id. at 727-28. We concur and find no abuse of discretion here.
 
 
 37
 We also find that the district court did not abuse its discretion when it determined that the amount of opposition to the proposed settlement did not compel its rejection. Id. at 728. Only thirteen per cent of the class submitted written objections in response to the notice of settlement. Compare Van Horn v. Trickey, 840 F.2d 604, 606 (8th Cir.1988) (settlement of class action approved despite objection of forty-five per cent (180 out of 400) of the prisoners). We are satisfied that the court properly considered and took into account all of the written objections filed with the court during the course of this litigation up to approval of the settlement.[12] Taifa, 846 F.Supp. at 728.
 
 
 38
 Given that the complaint in this case sought, in effect, to compel the very elimination of the MCC, we are not surprised that some of the prisoners would object to any proposed settlement that contemplated the continued existence of the MCC. Nevertheless, we agree with the district court that the settlement "achieves significant improvements or reforms" despite the fact that it may not provide all the relief desired by particular, individual inmates. Taifa, 846 F.Supp. at 728. To the extent that objecting members complain that the agreed entry does not go far enough in alleviating conditions at the MCC we reply that the "essence of settlement is compromise." Armstrong, 616 F.2d at 315. A settlement will not be rejected solely because it does not provide a complete victory to the plaintiffs. Hiram Walker, 768 F.2d at 889.
 
 
 39
 Similarly, the district court was entitled to give consideration to the opinion of competent counsel that the settlement was fair, reasonable and adequate. The district court relied upon affidavits outlining the qualifications of class counsel and perhaps more importantly upon its own observations over the course of the litigation as to the quality of the representation provided to the class. Taifa, 846 F.Supp. at 728. The court's observations in this regard are significant especially given the high degree of involvement of the district court in the settlement process. We agree with the district court that there is no reason in the record to suspect that the settlement is tainted by collusion. Id.
 
 
 40
 Finally, the district court noted that while settlement discussions began at an early stage in the litigation, it was satisfied that the discovery and investigation conducted by class counsel prior to entering into settlement negotiations was "extensive and thorough," dating at least as far back as ten months prior to the filing of the complaint. Taifa, 846 F.Supp. at 728-29.
 
 
 41
 For the foregoing reasons, we are satisfied that the district court did not abuse its discretion when it approved the settlement.
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 The settlement was comprised of an "agreed entry" as well as a separate document whereby the parties agreed that upon approval of the agreed entry, plaintiffs would dismiss their claims for injunctive relief pending in state court. It was further stipulated that the state court action would be dismissed in its entirety upon settlement of plaintiffs' individual claims for monetary damages
 
 
 [2]
 Objecting members complain that notices of settlement were not placed in common areas at the MCC, but cite no authority for any such requirement. We agree with the district court that the distribution of the Notice of Settlement as described herein satisfied the requirements of Fed.R.Civ.P. 23(e)
 
 
 [3]
 The agreed entry provides that the criteria for assignment are strictly restricted to "[a]n individual with a proven and/or documented history of at least one of the following criteria during the current period of incarceration: (a) Escapes with attempts to cause physical harm to staff, other prisoners, and/or the public at large, or to cause serious destruction to the physical plant. (b) Assaultive behavior against staff and/or prisoners causing serious bodily injury and/or death. (c) Rioting or inciting to riot or violence causing the serious disruption of the orderly management of a facility or unit. (d) Intensive involvement in violent gang activities. (e) Aggressive sexual conduct and/or rape."
 
 
 [4]
 A "vested month" is defined in the agreed entry as "a month in which the prisoner remains free of any disciplinary conviction for a Class A or B violation or three or more class C or D violations under ADPP." The ADPP is the Adult Disciplinary Policy and Procedure. In order to qualify for transfer on the basis of accumulating thirty-six vested months, the last six months must be consecutive without a conviction for either a Class A or B violation
 
 
 [5]
 Defendants' earlier Motion to Dismiss the appeals for lack of jurisdiction was granted in part, denied in part, and denied in part as moot in our order of January 25, 1995. We determined then that no final merits judgment has been entered in this case as plaintiffs' claims for damages remained unresolved. Accordingly, we do not have appellate jurisdiction under 28 U.S.C. § 1291
 
 
 [6]
 See, e.g., Gottlieb v. Wiles, 11 F.3d 1004 (10th Cir.1993); Croyden Associates v. Alleco, Inc., 969 F.2d 675 (8th Cir.1992), cert. denied, 507 U.S. 908, 113 S.Ct. 1251, 122 L.Ed.2d 650 (1993); Walker v. City of Mesquite, 858 F.2d 1071 (5th Cir.1988); Guthrie v. Evans, 815 F.2d 626 (11th Cir.1987)
 
 
 [7]
 The agreed entry does not refer to the MCC as either a "supermaximum" security institution or a "disciplinary segregation institution." The agreed entry does provide that once a prisoner has been assigned to the MCC, the prisoner will be assigned a Security Classification Designation of Level 5. The significance of this classification is not clear from the record. Even assuming arguendo that this is a "supermaximum" classification, objecting members fail to cite any Indiana authority that would render such a classification unlawful
 
 
 [8]
 In fact, the agreed entry provides that upon transfer to the MCC a prisoner's segregation status, if any, be it "administrative" or "disciplinary," is rescinded
 
 
 [9]
 Objecting members apparently rely here on Indiana Code §§ 11-11-5-6 and 7 (1993), which provide for five and thirty day status review, under certain circumstances, for prisoners subject to disciplinary segregation. As noted above, however, upon transfer to the MCC, a prisoner's segregation status, if any, be it "administrative" or "disciplinary," is rescinded
 
 
 [10]
 Indiana Code § 11-10-1-6 provides, in relevant part, that: "Sec. 6. The department shall, at least annually, review, in accord with sections 2 and 3 of this chapter, every committed offender not on parole to determine the appropriateness of his current classification and assignment and to make a classification-assignment decision based upon that review...."
 
 
 [11]
 We note here that in Sandin v. Conner, --- U.S. ----, ----, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995), the Supreme Court recently observed that state created liberty interests protected by the Due Process Clause "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (citations omitted)
 
 
 [12]
 We note that prior to the October 12, 1993 settlement hearing, counsel for plaintiff class supplied the district court with copies of all prisoner comments they had received. The court also reviewed all comments received directly from prisoners prior to the October 12, 1993 hearing as well as in response to the November notice of settlement. This is all in addition to the magistrate's journey to the MCC in February, 1993 to hold a preliminary hearing in order to receive comments from representative prisoners