In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-3572

FREDERICK A. UHL and TIMOTHY ELZINGA,
ON BEHALF OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

*v.*

THOROUGHBRED TECHNOLOGY AND
TELECOMMUNICATIONS, INC.,

*Defendant-Appellee*,

CATHY MASON,

*Intervenor/Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IPOO-1232-C B/S—**Sarah Evans Barker**, *Judge.*

ARGUED APRIL 3, 2002—DECIDED OCTOBER 29, 2002

Before COFFEY, DIANE P. WOOD and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* This litigation arose after Thoroughbred Technology & Telecommunications, Inc. (T-Cubed) announced that it had the right to install conduits for fiber optic cables along railroad right-of-way corridors. Timothy Elzinga, a property owner along a right-of-way owned by the Norfolk Southern Railway, disagreed.

In his view, such a use by T-Cubed without the permission of the adjacent landowners would amount to a slander of their title and a trespass. Discussions took place between Elzinga and T-Cubed, which eventually bore fruit in the form of a proposed class-wide settlement. This proposed settlement presumed that Elzinga would be certified as the representative of the putative class. With this much accomplished, Elzinga then filed suit and simultaneously sought certification of a settlement class, consisting of all the persons who owned real estate on either side of the railroad tracks along the route T-Cubed proposed to use for its cable.

One particular complication figures significantly in this appeal. At any given point, T-Cubed will lay fiber optic cable on only one side of the tracks. *Ex ante*, it is impossible to know which side that will be; detailed engineering surveys and technical criteria will govern the company's final choice. The settlement agreement attempts to deal with this uncertainty by dividing the class members into two categories: the Cable Side and the Non-Cable Side. (It does not address separately the possibility that one landowner might own land on both sides of the track; presumably such a person falls within both subgroups.) Under the terms of the agreement, the two groups will receive different forms of compensation. All class members, however, will become shareholders in Class Corridor, LLC (Class Corridor), a newly created limited liability company.

The appellant in this case, Cathy Mason, is an unnamed class member who claims that the settlement is unfair, and more formally, that it fails to satisfy the requirements of FED. R. CIV. P. 23(a) and (b). (While a dispute remains as to whether Mason will be entitled to any benefits under the settlement agreement, the fact that she is claiming that she should receive something is enough to ensure that she has standing to intervene.) The

district court granted Mason's motion to intervene, but it then overruled her objections and approved both the certification of the settlement class and the settlement agreement itself. We affirm.

**I**

The class Elzinga represents has approximately 58,000 members. They all own property along several thousand miles of railroad track.[1] Although some class members own their property in fee simple absolute, in most instances, the property immediately adjacent to the track is subject to an easement or right-of-way owned by Norfolk Southern Corporation (Norfolk Southern). Regardless, all parties admit that in many cases, title to the properties will be difficult to prove.

---

[1] The formal definition of the class reads as follows:

All persons or entities owning land that is under or adjacent to railroad corridors used by Norfolk Southern Railway Company, certain of its subsidiaries and Pennsylvania Lines LLC on the following ten point-to-point corridors (the "Settlement Corridors") on which T-Cubed plans to install telecommunications conduit and/or fiber optic cable:

|   |   |   |
|---|---|---|
| A. | Atlanta, GA - Jacksonville, FL | 362 miles |
| B. | Atlanta, GA - Chattanooga, TN | 170 miles |
| C. | Chattanooga, TN - Cincinnati, OH | 190 miles |
| D. | Chattanooga, TN - Memphis, TN | 299 miles |
| E. | Cincinnati, OH - Bellevue, OH | 263 miles |
| F. | Detroit, MI - Toledo, OH | 57 miles |
| G. | Atlanta, GA - Charlotte, NC | 220 miles |
| H. | Chicago, IL - Harrisburg, PA | 719 miles |
| I. | Harrisburg, PA - Alexandria, VA | 169 miles |
| J. | Cleveland, OH - Erie, PA | 73 miles |

Norfolk Southern granted to T-Cubed, its subsidiary, the right to lay fiber optic cable in the corridors along the railway easements. T-Cubed then announced its intention to install its cables in those corridors so that it could then market network services to communications providers. Elzinga's complaint alleged slander of title (arising from T-Cubed's claim that it has a property interest along the railroad right-of-way) and actual or threatened trespass (arising from T-Cubed's surveying of the property and its planned installment of conduits). On behalf of himself and the proposed class, he requested declaratory relief proclaiming the owners' interest in the land and injunctive relief prohibiting T-Cubed from taking further unlawful action.

Before we proceed to the details of the settlement agreement, we must first address the composition of the class the district court agreed to certify. The two groups within the class, the Cable Side and the Non-Cable Side, are determined by the eventual use of the side of the track on which the class members' property resides (which is a significant issue for those who do not own the property on both sides of a given section of track). As we noted above, this distinction is important because T-Cubed will lay its cables on only one side of the railroad track. Furthermore, T-Cubed has refused to identify which properties would be Cable Side and which would be Non-Cable Side, because it claimed that there was no way it could know until after it had entered the land and surveyed it (and thus committed the trespass the complaint was in part trying to prevent). As a result, class representative Elzinga had to agree to the settlement before knowing on which side of the tracks his own property fell. This "veil of uncertainty" exists as well for Mason; although she objects that the settlement agreement is not fair, she does not know whether she will be in the Cable Side or Non-Cable Side group.

Under the settlement approved by the district court, all class members, Cable Side and Non-Cable Side, will abandon any claims against T-Cubed and transfer an easement to T-Cubed for the specific purpose of laying cable. In exchange for the easement, depending upon whether they turn out to be Cable Side or Non-Cable Side, the class members will receive varying compensation.

In keeping with the fact that the Cable Side class members will have given up the most, they will receive the most generous compensation. T-Cubed will pay each one $6,000 per linear mile and a percentage of its revenue from the sale, lease, and license of the conduits it installs along the corridors. They will also receive ownership interests in the new company, Class Corridor, described below. The Non-Cable Side owners will not receive direct cash payments. They too, however, will receive the same kind of ownership interests in Class Corridor, and will benefit financially in their capacity as shareholders.

The settlement agreement places Class Corridor at the heart of the overall process. All class members (Cable Side and Non-Cable Side), will transfer easements to the new company. T-Cubed, for its part, must give Class Corridor assets including dark optical fiber and an option for Class Corridor to purchase a conduit from T-Cubed. In addition, if T-Cubed leases or sells four or more conduit systems to a telecommunications company, T-Cubed will pay either $316 per fiber mile or up to 16 dark fibers to Class Corridor. T-Cubed will also transfer non-cash telecommunication assets to Class Corridor, permitting it either to own and manage a telecommunications company or to take a specified sum of money. Finally, Class Corridor will convey all Cable Side easements to T-Cubed once T-Cubed determines which side of the corridor it will use for its cables. If T-Cubed fails to install a telecommunication system along the railway,

the easements will terminate four years after the effective date of the approval of the settlement.

As noted above, class members will be entitled to share in any revenues that Class Corridor may earn from the telecommunication assets. They will own 100% of the company at a rate of one membership share for each ten linear feet of real estate owned by that class member, along with apportioned voting rights. Shareholder distributions are within the discretion of the Class Corridor Board of Directors and will be made as reasonably determined.

Finally, class counsel will receive $2,000 per linear mile for the first three conduits installed in the settlement corridors, a percentage of T-Cubed's gross receipts with respect to the fourth and successive conduits, and 25% of certain revenues generated by Class Corridor or the cash payment to which Non-Cable Side class members are entitled from Class Corridor. This means that class counsel will receive compensation of the same type and at the same time as class members; as one expert testified, class counsel can never receive compensation that is more advantageous than that which goes to the class members.

Mason acknowledges that Class Corridor has an upside, in that it permits class members to participate in any successes in the telecommunications market and to have greater control over future uses of their property. She points out, however, that there is also a downside. Most importantly in her view, any future benefit the class members may receive from Class Corridor is speculative. Class Corridor may never be able to commence its intended business, it might not be able to raise sufficient financing to fund its operations, and it may experience difficulties achieving profitability. As readers of the business pages of the newspapers know all too well at this

point, the telecommunications market has been volatile. This means that, insofar as their compensation is tied to Class Corridor, the class members might do very well or they might wind up empty-handed.

The district court was aware of these gloomier possibilities. Despite that, the court approved the settlement agreement. Overall, the court found it to be fair to all parties, particularly in light of the potential weakness of the plaintiffs' individual cases and the risks for all parties that accompanied delay. It also found that Elzinga could adequately represent all the class members, future Cable Side and Non-Cable Side, and certified the class over Mason's objections.

## II

### A.  Jurisdictional Amount

Before proceeding to the merits we must first satisfy ourselves that the $75,000 amount in controversy requirement of 28 U.S.C. § 1332(a) has been met. This amount is determined by an evaluation of the controversy described in the plaintiff's complaint and the record as a whole, as of the time the case was filed. *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 366 (7th Cir. 1993). It is obvious that in conducting the required inquiry the court may consider the value of any benefit the named representatives may receive. In a case that seeks only money damages, the amount the defendant will lose is more or less the same. But in a case like this one, for injunctive relief, there may be an asymmetry. The question has thus arisen whether it is proper in determining amount in controversy to look in the alternative to the cost the defendant will incur in complying with the injunction the plaintiff seeks. In this circuit, the answer to the latter question has been yes: it is established that the jurisdictional amount should be assessed looking at either the

benefit to the plaintiff or the cost to the defendant of the requested relief—the so-called "either viewpoint" rule. See, *e.g.*, *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 609 (7th Cir. 1997); *McCarty v. Amoco Pipeline Co.*, 595 F.2d 389, 391-95 (7th Cir. 1979). Those cases specifically establish that the cost to a defendant of complying with an injunction sought by the plaintiff may properly be considered in determining the amount in controversy. As the Ninth Circuit recognized in *In re Ford Motor Co./Citibank (South Dakota), N.A.*, 264 F.3d 952, 958-59 (9th Cir. 2001), *cert. granted under the name Ford Motor Co. v. McCauley*, 122 S. Ct. 1063 (2002) (No. 01-896), it may be more difficult to make this assessment in the class action context. We too have recognized that there are difficulties in that situation, but we have chosen to resolve them by looking separately at each named plaintiff's claim and the cost to the defendant of complying with an injunction directed to that plaintiff. *Brand Name Drugs*, 123 F.3d at 610. In our view, that ensures that we are not undermining the nonaggregation rule that still applies to class actions where the named plaintiff's claim does not satisfy the jurisdictional amount. The Ninth Circuit apparently rejected our approach in its *Ford Motor Co.* opinion. The Supreme Court now has the case under advisement, and we recognize that its decision may affect the rule we have followed. Nonetheless, we see no reason to hold this case for the decision in *Ford Motor Co.*; instead, we respectfully choose to adhere to the *Brand Name Drugs* approach. We are confident that the parties will be able to preserve their rights to have any contrary Supreme Court ruling applied, should the Court find the Ninth Circuit's approach persuasive.

The reason it is necessary to consider this wrinkle of jurisdictional doctrine stems from the fact that Elzinga was unsure whether he was on Cable Side or Non-Cable

Side. This means that there is a serious question whether his injury satisfied the jurisdictional amount. Standing alone, the value of an easement on his property is probably insufficient: the relief he requested in his complaint was primarily declaratory, and if he ends up being on the Non-Cable Side, the trespass will be solely for the purpose of surveying the land. Elzinga argues, however, that under the "either viewpoint" rule, there is more than $75,000 at stake with his individual claim (which is necessary even under this court's view of the scope of 28 U.S.C. § 1367 and *Zahn v. International Paper Corp.*, 414 U.S. 291 (1973), see *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 930-33 (7th Cir. 1996)). He asserts that it is unquestioned that T-Cubed would have to spend more than $75,000 to avoid the costs of injunction and condemnation even if only his land was involved. See *McCarty*, 595 F.2d at 395. Mason has offered nothing to refute that factual assertion. We are satisfied, looking at this case from T-Cubed's viewpoint, that the jurisdictional amount requirement of § 1332 is satisfied, *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 329-30 (7th Cir. 1993), and we therefore proceed to Mason's next challenge.

## B. Justiciability

This one, which Mason raised at oral argument, also goes to the court's jurisdiction: she claims that the claims of the class members are non-justiciable at this stage of the proceedings. To resolve this justiciability argument, we must look at how the class is defined. If, as Mason argues, the class's claims are future claims, largely hypothetical at this stage, then the claims may not be ripe. If that were true, we would have to vacate the order below and our analysis would end here. See generally *U.S. Bancorp. Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 21-23 (1994) (vacatur proper where mootness

arises from external circumstances or from unilateral action of prevailing party; or case was always moot).

The class in this case has some similarities to certain toxic tort cases, insofar as the eventual harm to the class members was uncertain at the time the complaint was filed and at the time of the settlement. But the similarity is not complete, and in the end it tends more to support the plaintiffs than to undermine them. In many toxic tort cases, uncertainties abound: which class members were exposed to the substance? who has suffered compensable injuries already? who may never suffer injuries? But if the risk itself is immediate, contingent claims based on that risk are justiciable and are routinely addressed both in toxic tort settlements and in bankruptcy proceedings. In this case, parts of the controversy are already unquestionably ripe: the class members' titles have already been slandered, and T-Cubed will need to enter the property at least for purposes of its surveys. The only thing (important though it is) that is not known is whether any particular owner will be Cable Side or Non-Cable Side (or both). Furthermore, at the time of settlement, the slander claim was justiciable because some harm had already occurred. This is enough to permit the court to address the entire suit, including the claims for trespass and the injunction. On these facts, those claims are in no way hypothetical; their immediacy and their relation to the slander claim is enough to permit the court to address the entire controversy.

This is particularly true in light of the fact that we are addressing a settlement. *Williams v. General Elec. Capital Auto Lease*, 159 F.3d 266, 274 (7th Cir. 1998) ("It is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other."). The fact that each individual class member did not know the full extent of the burden she would suffer is unimportant.

T-Cubed claimed rights to all of the property, and the settlement required all class members to provide T-Cubed with an easement.

## III

Satisfied that we may proceed to the merits, we turn next to the issue of class certification. We review the district court's certification of a class for an abuse of discretion. This is true even in the settlement context. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 630 (1997); *Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). For a district court to certify a class under Rule 23(a) of the FEDERAL RULES OF CIVIL PROCEDURE, the class must satisfy the requirements of (1) numerosity; (2) commonality; (3) typicality; and (4) representativeness.

### A. Class Representative

Much of Mason's argument centers around what she deems conflicting subgroups that were only assigned one representative. In *Amchem*, 521 U.S. at 619, and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 828 n.6 (1999), the Supreme Court emphasized that although settlement is relevant to class certification, the requirements of Rule 23 must still be satisfied. Thus, a district court may not abandon the Federal Rules merely because a settlement seems fair, or even if the settlement is a "good deal." In some ways, the Rule 23 requirements may be even more important for settlement classes, for which (as this court has put it), the district court must act almost as a fiduciary of the class when approving settlements. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002).

A class may not satisfy the requirements of Rule 23(a)(4) if the class representative does not "possess the

same interest and suffer the same injury as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citing *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974)). This requires the district court to ensure that there is no inconsistency between the named parties and the class they represent. *Amchem*, 521 U.S. at 625. As the Supreme Court also noted in *Amchem*, some classes are more prone than others to intra-class conflicts that are not suitable for a single class representative—even if the single class representative believes "that the Settlement serves the aggregate interests of the entire class." 521 U.S. at 627.

Although Mason has expressed legitimate concerns about Elzinga's literal and figurative representation of both sides of the track, we think she misses the mark in the end. Her objection is premised on the idea that the class must be viewed solely from an *ex post* perspective. See John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1435-36 (1995). Nothing in *Amchem* compels such an approach. In *Amchem*, the Court found the class to be overbroad in part because it contained both exposure-only and currently injured plaintiffs. In the instant case all members of the class are, for the most significant part of the feared damages, "exposure only": they have all been slandered and many have suffered a surveying trespass, but they are unaware if they will yet suffer trespass injuries from the installation of cable. Thus, if we view Elzinga's adequacy at the time of the settlement, he was in the same position as all class members. T-Cubed did not limit its claims to rights in Cable Side property; it claimed rights to all property adjacent to and beneath the railway.

Moreover, the fact that Cable Side and Non-Cable Side will receive different compensation under the settlement

does not make it novel or unfair. See *Petrovic v. Amoco*, 200 F.3d 1140, 1147 (8th Cir. 1999) (holding differences in the amount of damages do not necessarily prohibit class certification). True, the district court could have appointed two representatives, one to represent the future Cable Side owners and one to represent the future Non-Cable Side owners. But we see no reason why it was compelled to do this, since the named representative had an equal incentive to represent both sides as long as he did not know where his property would end up. Until the cable has been laid, no "Cable Side" exists. In the end the Cable Side and Non-Cable Side may have diverging goals—the classes are mutually exclusive; by definition, Elzinga cannot be on both sides of the track. Cable Side's goal would be compensation for the conduits on their land, while the Non-Cable Side goal would be preparation for future infringement by telecommunications groups through the formation of Class Corridor.

The district court observed that Elzinga was able to serve as a good class representative because he would be a "concrete working example of John Rawls' celebrated theory of the 'veil of ignorance.'" We need not decide if we have a pure Rawlsian situation here, or what the legal consequences should be if we did. The important fact is that Elzinga was not merely an uninterested neutral participant, unable to serve as an effective advocate for the class. He was someone who had a real stake in all aspects of the case: the slander of title claims, the surveying trespass claims, and the cable conduit trespass claims. See *Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir. 1991). In light of the arguments presented to it, the district court did not abuse its discretion in finding Elzinga satisfied the requirements of Rule 23(a)(4). (We do not comment on whether possible differences in ownership rights, state law, or other factors should have influenced the certification decision, as Mason does not

rely on these factors to challenge the propriety of the settlement class. See, *e.g.*, *Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001) (reversing certification of a class in a similar case).)

## B. Class Corridor

Having determined that the district court did not abuse its discretion in certifying the class, we at last turn to the merits of the decision to approve the settlement. Mason argues that the settlement is not fair in large part because it relies so heavily on the newly created Class Corridor. Federal courts favor settlement, so the district court's inquiry into the settlement structure is limited to whether the settlement is lawful, fair, reasonable and adequate. *Isby v. Bayh*, 75 F.3d 1191, 1198-99 (7th Cir. 1996). Mason must do more than just argue that she would have preferred a different settlement structure, as this court's review of the settlement structure is even more narrow. We will reject the district court's decision to approve it only if we find an abuse of discretion. *Id.*

In approving the settlement, the district court considered factors from the Manual for Complex Litigation and Moore's Federal Practice. It placed considerable weight on the strength (or lack thereof) of the plaintiffs' case on the merits. It noted the potential difficulty for individual landowners to bring this claim. Although T-Cubed claimed that it owned all of the easements, what is more likely is that some of the individual landowners own the land outright, some may have granted the railroad easements strictly limited to railroad purposes, and others may have granted broader easements to Norfolk Southern that it could convey immediately to T-Cubed. See *Isaacs*, 261 F.3d at 681-82 (noting in a similar class action the difficulty in identifying different conveyances

by and to different parties made at different times over a period of more than a century).

Mason agrees that the settlement is probably a good deal overall, and applauds class counsel for reaching such an unusual and innovative settlement. Her complaint is only that the settlement runs the risk of leaving Non-Cable Side class members without any compensation at all (even though, if Class Corridor succeeds, all class members might benefit handsomely from it). We agree with Mason that the future of Class Corridor is indeed speculative, despite what the appellees describe as a "blue-ribbon" Board of Advisors ready to propose a Board of Directors, and despite the fact that T-Cubed is obligated to give it certain assets. Class Corridor will have the burdens of any startup company—no employees, officers, operating capital, or startup financing to meet daily expenses. But it is unclear why this makes the Non-Cable Side class members worse off than they would be without the settlement, recalling that by definition T-Cubed would not be buying a permanent easement from them. *In re Mexico Money Transfer Litigation*, 267 F.3d 743, 748 (7th Cir. 2001) ("[O]ne must ask whether the value of relief in the aggregate is a reasonable approximation of the value of plaintiffs' claim."). Non-Cable Side's only injuries are the slander of title and the limited trespass for survey purposes. Although, under the settlement, they will remain encumbered by a telecommunications easement owned by Class Corridor, this unused easement is not likely to be much different from the railroad easement to which much of this property was subject. Therefore, the fact that Non-Cable Side's recovery is minimal is unproblematic since their damages are also minimal. Indeed the only recovery ordinarily granted for slander is the cost of clearing the title—in this case, title to land the individual might not even have.

We also think this settlement structure is different from the one rejected by the Second Circuit in *In re Agent Orange Product Liability Litigation*, 818 F.2d 179, 181 (2d Cir. 1987). In *Agent Orange*, the district court devised an independent foundation to administer funds on behalf of class members. The Second Circuit rejected the district court's transfer of judicial duties to an independent organization as "there is no principle of law authorizing such a broad delegation of judicial authority to private parties." *Id.* at 185. Unlike the independent body the *Agent Orange* court disapproved, Class Corridor is not only a product of the settlement. It signed the settlement agreement. Like the other parties to the agreement, it will remain under the district court's jurisdiction as it distributes cash and shares. Moreover, issuing securities as a settlement has long been accepted. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997). Perhaps there could have been an even more creative settlement or, alternatively, one that is more traditional. But that is not the question we must resolve. The district court did not abuse its discretion when it determined that the settlement before it (on behalf of a class from which only 250 of the 58,000 class members opted out) complied with Rule 23.

## IV

We AFFIRM the judgment of the district court.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*