**Berrell FREEMAN, et al.,
Plaintiffs–Appellants,**

v.

**Gerald A. BERGE, Warden, Wisconsin Secure Program Facility, and Matthew J. Frank, Secretary, Wisconsin Department of Corrections, Defendants–Appellees.**

No. 02–2191.

United States Court of Appeals,
Seventh Circuit.

Submitted June 18, 2003.*

Decided June 20, 2003.

Before MANION, ROVNER, and
DIANE P. WOOD, Circuit Judges.

## ORDER

Berrell Freeman and seven of his fellow unnamed class members appeal *pro se* from the district court's judgment approving a settlement of their civil rights suit that challenged the conditions at the Wisconsin Secure Program Facility in Bosco-

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

bel, Wisconsin. Because they have not demonstrated that the district court abused its discretion in rejecting their objections and approving the settlement, we affirm.

## Background

The Wisconsin Secure Program Facility, formerly known as the Supermax Correctional Institution, is a 500–bed technologically advanced, super-maximum prison in northern Wisconsin purportedly designed to house the state's most dangerous and recalcitrant inmates. The conditions at the prison are isolating and unpleasant for all of its inmates but particularly for those in the most restrictive levels of custody. The prison employs an incentive system; inmates sent there typically start in the most restrictive level, Level One, and with good behavior can progress to the least restrictive, Level Five, and then to another institution. The district court described the conditions on Level One at the time of this suit as especially harsh, ranging from sensory deprivation to extreme isolation and near-total confinement to their cells:

> Inmates on Level One at the State of Wisconsin's Supermax Correctional Institution in Boscobel, Wisconsin spend all but four hours a week confined to a cell. The "boxcar" style door on the cell is solid except for a shutter and a trap door that opens into the dead space of a vestibule through which a guard may transfer items to the inmate without interacting with him. The cells are illuminated 24 hours a day. Inmates receive no outdoor exercise. Their personal possessions are severely restricted: one religious text, one box of legal materials and 25 personal letters. They are permitted no clocks, watches, cassette players or televisions. The temperature fluctuates wildly, reaching extremely high and low temperatures depending on the season. A video camera rather than a human eye monitors the inmate's

movements. Visits other than with lawyers are conducted through video screens.

*See Jones 'El v. Berge,* 164 F.Supp.2d 1096, 1098 (W.D.Wis.2001). Many inmates, particularly mentally ill prisoners, could not adequately conform their behavior to the institutional requirements and found themselves stuck in Level One for months at a time. Not surprisingly, the harsh conditions in the most restrictive levels of custody exacerbated the symptoms of mentally ill prisoners.

Shortly after the prison opened in Fall 1999, inmates Dennis Jones'el and Micha'el Johnson sued their custodians on behalf all of Supermax inmates, alleging among other things that the conditions at the prison were so severe that they ran afoul of the Eighth Amendment's prohibition against cruel and unusual punishment. The district court appointed counsel for Jones'el, Johnson, and the class of "all persons who are now, or will in the future be, confined at Supermax Correctional Institution in Boscobel, Wisconsin," which the court certified for injunctive relief only. Shortly thereafter the plaintiffs moved for preliminary injunctive relief focusing exclusively on the seriously mentally ill inmates. In October 2001 the court granted the plaintiffs' motion, ordering the defendants to stop housing seriously mentally ill inmates at the facility and to arrange for independent mental health professionals to immediately evaluate certain categories of inmates. *See Jones 'El,* 164 F.Supp.2d at 1125–26.

Two months later, after extensive negotiations among class counsel, the named plaintiffs, and counsel for defendants, a comprehensive settlement was reached. In addition to restricting the defendants' ability to house mentally ill inmates at the prison, the agreement purports to guarantee all inmates confined there at least the

same rights and privileges of inmates confined in segregation in other maximum security prisons in the state. The defendants agreed to ease the extreme isolation and sensory deprivation by restricting the time during which inmates could remain in Level One status to not more than seven days absent cause and for an additional seven days with cause. Inmates were to be provided more out-of-cell exercise, cell shutters that open to the hallway, more reading material, expanded face-to-face visitation, a minimum of three showers a week, reduced physical restraints, increased phone privileges, calendar clocks in each cell to give them some temporal reference, and dim cell lighting at night to ease sleep. Notably, the defendants also agreed to build an outdoor recreational area, regulate cell temperatures, and refrain from using certain stunning devices inside cells and from punishing prisoners by feeding them nothing but "nutri-loaf," a blended and baked compost of prison food. An independent monitor was appointed to ensure that the agreement was implemented properly.

The district court gave notice of the proposed settlement to the class members and permitted them thirty days to object or otherwise comment. More than 100 prisoners objected to various aspects of the proposed settlement, including Freeman and the other seven appellants. The district court reviewed the objections at a "fairness" hearing held on March 8, 2002, and a few weeks later approved the settlement. In its March 28, 2002 order of approval, the court noted that the common theme of the objections was that the proposed settlement did not go far enough in alleviating the harsh conditions at the prison. The district court, however, reasoned that as much as the objectors "would like to have a broader scope of relief," the agreement "achieved a great deal" in ameliorating the most oppressive conditions. The court went on to conclude that the settlement was "fair, reasonable, lawful and adequate as a resolution of this class action." The agreement left it up to the district court to define "mental illness." After holding hearings on that issue, the court set forth a definition and entered final judgment approving the agreement on June 24, 2002. This appeal followed.

### Analysis

■ At the outset, we note that unnamed class members like these appellants who objected to the proposed settlement in the district court are entitled to appeal the court's decision to disregard their objections and approve the agreement. *See Devlin v. Scardelletti*, 536 U.S. 1, 14, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002). Our review of the district court's decision to approve the agreement, however, is narrow; we will reverse only if the district court abused its discretion. *See Uhl v. Thoroughbred Technology & Telecommunications, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir.1996). Because federal courts favor the settlement of class action litigation, a district court properly limits its inquiry to whether the proposed settlement is lawful, fair, reasonable, and adequate. *Uhl*, 309 F.3d at 986.

Freeman and the other unnamed class members contend that the district court abused its discretion in approving a settlement that, in their view, is unlawful insofar as it allows conditions at the prison to remain below constitutional standards. This is not, however, the right way to look at the settlement. Our focus is upon the general principles governing approval of class action settlements and not upon the substantive law governing the claims asserted in the litigation. *Isby*, 75 F.3d at 1197. The presence of constitutional claims does not prevent us from applying those principles, so long as the agreement

does not "authorize[ ] the continuation of clearly illegal conduct." *Id.* In making that determination, this court must not decide unsettled legal questions; "any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement." *Id.* As such, "prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule." *Id.* (internal citation and quotations omitted).

▌ The appellants do not come close to making that showing here. They do not identify any specific illegal or unconstitutional practice that is certain to continue despite the agreement. Rather, they generally complain that the agreement leaves too much discretion in the hands of prison administrators to implement the "thousands of rules, regulations, policies, and procedures enforced upon the prisoners"; permits substantially more restrictive conditions than those in the state's other maximum security prisons; and does not adequately address the mental deterioration to healthy inmates caused by those conditions. In affirming the approval of a settlement of a similar prison conditions case, we cautioned that "the essence of settlement is compromise.... A settlement will not be rejected solely because it does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200 (internal citation and quotations omitted). Likewise, although appellants may not have gotten everything they wanted here, the settlement achieved significant reforms, limiting substantially the amount of time inmates could be continuously confined to Level One and mandating comprehensive improvements aimed at generally reducing the isolation and sensory deprivation that the inmates experience throughout the prison. We cannot say that there is anything unlawful from the face of this agreement.

The appellants' arguments concerning the agreement's maintenance of the "level" program at the prison do not suggest otherwise. They argue that the agreement gives the warden unfettered discretion to extend an inmate's stay on Level One past the seven days prescribed by the agreement. But, contrary to the appellants' assertion, the warden's discretion to exceed the seven days is confined; the monitor must be notified of all stays exceeding more than fourteen days, and any extended stays must be supported by serious disciplinary infractions established after a hearing. They also argue that the agreement is illegal because it does not mandate hearings to review level determinations. The district court considered this argument at the fairness hearing but properly rejected it, noting that the court had denied the class leave to proceed on that issue because "Supreme Court law is so clear that those kind of hearings are not required for promotion or demotion from one level to another." Indeed, appellants would face an uphill battle to demonstrate their entitlement to due process before being transferred among levels, since prisoners generally do not have a federally protected liberty interest in being housed in a particular facility or a less restrictive area within a facility. *See Sandin v. Connor*, 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Pischke v. Litscher*, 178 F.3d 497, 499 (7th Cir.1999). In any event, the settlement agreement requires that only prisoners placed in a "specified segregation status" may be sent to the prison and that those prisoners receive a disciplinary hearing before being placed in that status.

▌ The appellants' criticisms of the agreement do not show that it was unlawful, much less that the district court erred in finding the settlement fair, reasonable, and adequate. In making that determination, a district court should examine (1) the

strength of the plaintiffs' case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement. *Isby*, 75 F.3d at 1199. The district court properly considered those factors. The court found that the class members probably attained better results from the settlement than they would have obtained after a lengthy, expensive, and complex trial. Although class members objected to various aspects of the settlement, the court correctly noted that many of the objections concerned individualized complaints or matters that were never raised in the lawsuit or approved for class certification (such as the absence of hearings for level determinations), and lacked merit in any event. The court further reasoned that the monitor could address individual complaints not explicitly covered by the agreement. Finally, the district court also properly relied on the opinion of class counsel, a team of experienced and well-respected civil rights attorneys, who reached this agreement only after exhaustive negotiations and extensive discovery. We are fully satisfied that the district court properly exercised its discretion in this case when disregarding the appellants' objections and approving the settlement.

■ The appellants also contend that over the past year the agreement has done little to change anything at the prison except its name. To the extent that these prisoners believe that the defendants have not lived up to their end of the bargain, however, their remedy is to enforce the agreement, not attack it.

AFFIRMED